TIMES FILM CORP. *v.* CITY OF CHICAGO ET AL.

No. 34.   Argued October 19–20, 1960.—Decided January 23, 1961.

*Felix J. Bilgrey* and *Abner J. Mikva* argued the cause and filed a brief for petitioner.

*Robert J. Collins* and *Sydney R. Drebin* argued the cause for respondents. With them on the brief was *John C. Melaniphy.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioner challenges on constitutional grounds the validity on its face of that portion of § 155–4 [1] of the Municipal Code of the City of Chicago which requires submission of all motion pictures for examination prior to their public exhibition. Petitioner is a New York corporation owning the exclusive right to publicly exhibit in Chicago the film known as "Don Juan." It applied for a permit, as Chicago's ordinance required, and tendered the license fee but refused to submit the film for examination. The appropriate city official refused to issue the permit and his order was made final on appeal to the Mayor. The sole ground for denial was petitioner's refusal to submit the film for examination as required. Petitioner then brought this suit seeking injunctive relief ordering the issuance of the permit without submission of the film and restraining the city officials from interfering with the exhibition of the picture. Its sole ground is that the provision of the ordinance requiring submission of the film constitutes, on its face, a prior restraint within the prohibition of the First and Fourteenth Amendments. The District Court dismissed the complaint on the grounds, *inter alia,* that neither a substantial federal question nor even a justiciable controversy was presented. 180 F. Supp. 843. The Court of Appeals affirmed, finding that the case presented merely an abstract question of law since neither the film nor evidence of its content was submitted. 272 F. 2d 90. The precise question at issue here never hav-

---

[1] The portion of the section here under attack is as follows:

"Such permit shall be granted only after the motion picture film for which said permit is requested has been produced at the office of the commissioner of police for examination or censorship. . . ."

ing been specifically decided by this Court, we granted certiorari, 362 U. S. 917 (1960).

We are satisfied that a justiciable controversy exists. The section of Chicago's ordinance in controversy specifically provides that a permit for the public exhibition of a motion picture must be obtained; that such "permit shall be granted only after the motion picture film for which said permit is requested has been produced at the office of the commissioner of police for examination"; that the commissioner shall refuse the permit if the picture does not meet certain standards; [2] and that in the event of such refusal the applicant may appeal to the mayor for a *de novo* hearing and his action shall be final. Violation of the ordinance carries certain punishments. The petitioner complied with the requirements of the ordinance, save for the production of the film for examination. The claim is that this concrete and specific statutory require-

---

[2] That portion of § 155–4 of the Code providing standards is as follows:

"If a picture or series of pictures, for the showing or exhibition of which an application for a permit is made, is immoral or obscene, or portrays depravity, criminality, or lack of virtue of a class of citizens of any race, color, creed, or religion and exposes them to contempt, derision, or obloquy, or tends to produce a breach of the peace or riots, or purports to represent any hanging, lynching, or burning of a human being, it shall be the duty of the commissioner of police to refuse such permit; otherwise it shall be his duty to grant such permit.

"In case the commissioner of police shall refuse to grant a permit as hereinbefore provided, the applicant for the same may appeal to the mayor. Such appeal shall be presented in the same manner as the original application to the commissioner of police. The action of the mayor on any application for a permit shall be final."

It should be noted that the Supreme Court of Illinois, in an opinion by Schaefer, C. J., has already considered and rejected an argument against the same Chicago ordinance, similar to the claim advanced here by petitioner. The same court also sustained certain of the standards set out above. *American Civil Liberties Union* v. *City of Chicago,* 3 Ill. 2d 334, 121 N. E. 2d 585 (1954).

ment, the production of the film at the office of the Commissioner for examination, is invalid as a previous restraint on freedom of speech. In *Joseph Burstyn, Inc.*, v. *Wilson*, 343 U. S. 495, 502 (1952), we held that motion pictures are included "within the free speech and free press guaranty of the First and Fourteenth Amendments." Admittedly, the challenged section of the ordinance imposes a previous restraint, and the broad justiciable issue is therefore present as to whether the ambit of constitutional protection includes complete and absolute freedom to exhibit, at least once, any and every kind of motion picture. It is that question alone which we decide. We have concluded that § 155–4 of Chicago's ordinance requiring the submission. of films prior to their public exhibition is not, on the grounds set forth, void on its face.

Petitioner's narrow attack upon the ordinance does not require that any consideration be given to the validity of the standards set out therein. They are not challenged and are not before us. Prior motion picture censorship cases which reached this Court involved questions of standards.[3] The films had all been submitted to the authorities and permits for their exhibition were refused because of their content. Obviously, whether a particular statute is "clearly drawn," or "vague," or "indefinite," or whether a clear standard is in fact met by a film are different questions involving other constitutional challenges to be tested by considerations not here involved.

Moreover, there is not a word in the record as to the nature and content of "Don Juan." We are left entirely

---

[3] *Joseph Burstyn, Inc.*, v. *Wilson, supra* ("sacrilegious"); *Gelling* v. *Texas*, 343 U. S. 960 (1952) ("prejudicial to the best interests of the people of said City"); *Commercial Pictures Corp.* v. *Regents*, 346 U. S. 587 (1954) ("immoral"); *Superior Films, Inc.*, v. *Department of Education*, 346 U. S. 587 (1954) ("harmful"); *Kingsley International Pictures Corp.* v. *Regents*, 360 U. S. 684 (1959) ("sexual immorality").

in the dark in this regard, as were the city officials and the other reviewing courts. Petitioner claims that the nature of the film is irrelevant, and that even if this film contains the basest type of pornography, or incitement to riot, or forceful overthrow of orderly government, it may nonetheless be shown without prior submission for examination. The challenge here is to the censor's basic authority; it does not go to any statutory standards employed by the censor or procedural requirements as to the submission of the film.

In this perspective we consider the prior decisions of this Court touching on the problem. Beginning over a third of a century ago in *Gitlow* v. *New York,* 268 U. S. 652 (1925), they have consistently reserved for future decision possible situations in which the claimed First Amendment privilege might have to give way to the necessities of the public welfare. It has never been held that liberty of speech is absolute. Nor has it been suggested that all previous restraints on speech are invalid. On the contrary, in *Near* v. *Minnesota,* 283 U. S. 697, 715–716 (1931), Chief Justice Hughes, in discussing the classic legal statements concerning the immunity of the press from censorship, observed that the principle forbidding previous restraint "is stated too broadly, if every such restraint is deemed to be prohibited. . . . [T]he protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases." These included, the Chief Justice found, utterances creating "a hindrance" to the Government's war effort, and "actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops." In addition, the Court said that "the primary requirements of decency may be enforced against obscene publications" and the "security of the community life may be protected against incitements to acts of violence and the overthrow by force

of orderly government." Some years later, a unanimous Court, speaking through Mr. Justice Murphy, in *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572 (1942), held that there were "certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Thereafter, as we have mentioned, in *Joseph Burstyn, Inc.,* v. *Wilson, supra,* we found motion pictures to be within the guarantees of the First and Fourteenth Amendments, but we added that this was "not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places." At p. 502. Five years later, in *Roth* v. *United States,* 354 U. S. 476, 483 (1957), we held that "in light of . . . history, it is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance." Even those in dissent there found that "Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it." *Id.,* at 514. And, during the same Term, in *Kingsley Books, Inc.,* v. *Brown,* 354 U. S. 436, 441 (1957), after characterizing *Near* v. *Minnesota, supra,* as "one of the landmark opinions" in its area, we took notice that *Near* "left no doubts that 'Liberty of speech, and of the press, is also not an absolute right . . . the protection even as to previous restraint is not absolutely unlimited.' . . . The judicial angle of vision," we said there, "in testing the validity of a statute like § 22–a [New York's injunctive remedy against certain forms of obscenity] is 'the operation and effect of the statute in substance.' " And as if to emphasize the point involved

here, we added that "The phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test." Even as recently as our last Term we again observed the principle, albeit in an allied area, that the State possesses some measure of power "to prevent the distribution of obscene matter." *Smith* v. *California,* 361 U. S. 147, 155 (1959).

Petitioner would have us hold that the public exhibition of motion pictures must be allowed under any circumstances. The State's sole remedy, it says, is the invocation of criminal process under the Illinois pornography statute, Ill. Rev. Stat. (1959), c. 38, § 470, and then only after a transgression. But this position, as we have seen, is founded upon the claim of absolute privilege against prior restraint under the First Amendment—a claim without sanction in our cases. To illustrate its fallacy, we need only point to one of the "exceptional cases" which Chief Justice Hughes enumerated in *Near* v. *Minnesota, supra,* namely, "the primary requirements of decency [that] may be enforced against obscene publications." Moreover, we later held specifically "that obscenity is not within the area of constitutionally protected speech or press." *Roth* v. *United States,* 354 U. S. 476, 485 (1957). Chicago emphasizes here its duty to protect its people against the dangers of obscenity in the public exhibition of motion pictures. To this argument petitioner's only answer is that regardless of the capacity for, or extent of, such an evil, previous restraint cannot be justified. With this we cannot agree. We recognized in *Burstyn, supra,* that "capacity for evil . . . may be relevant in determining the permissible scope of community control," at p. 502, and that motion pictures were not "necessarily subject to the precise rules governing any other particular method of expression. Each method," we said, "tends to present its own peculiar problems." At p. 503. Certainly petitioner's broadside

attack does not warrant, nor could it justify on the record here, our saying that—aside from any consideration of the other "exceptional cases" mentioned in our decisions—the State is stripped of all constitutional power to prevent, in the most effective fashion, the utterance of this class of speech. It is not for this Court to limit the State in its selection of the remedy it deems most effective to cope with such a problem, absent, of course, a showing of unreasonable strictures on individual liberty resulting from its application in particular circumstances. *Kingsley Books, Inc.,* v. *Brown, supra,* at p. 441. We, of course, are not holding that city officials may be granted the power to prevent the showing of any motion picture they deem unworthy of a license. *Joseph Burstyn, Inc.,* v. *Wilson, supra,* at 504–505.

As to what may be decided when a concrete case involving a specific standard provided by this ordinance is presented, we intimate no opinion. The petitioner has not challenged all—or for that matter any—of the ordinance's standards. Naturally we could not say that every one of the standards, including those which Illinois' highest court has found sufficient, is so vague on its face that the entire ordinance is void. At this time we say no more than this—that we are dealing only with motion pictures and, even as to them, only in the context of the broadside attack presented on this record.

*Affirmed.*

Mr. Chief Justice Warren, with whom Mr. Justice Black, Mr. Justice Douglas and Mr. Justice Brennan join, dissenting.

I cannot agree either with the conclusion reached by the Court or with the reasons advanced for its support. To me, this case clearly presents the question of our approval of unlimited censorship of motion pictures before exhibition through a system of administrative

licensing. Moreover, the decision presents a real danger of eventual censorship for every form of communication, be it newspapers, journals, books, magazines, television, radio or public speeches. The Court purports to leave these questions for another day, but I am aware of no constitutional principle which permits us to hold that the communication of ideas through one medium may be censored while other media are immune. Of course each medium presents its own peculiar problems, but they are not of the kind which would authorize the censorship of one form of communication and not others. I submit that in arriving at its decision the Court has interpreted our cases contrary to the intention at the time of their rendition and, in exalting the censor of motion pictures, has endangered the First and Fourteenth Amendment rights of all others engaged in the dissemination of ideas.

*Near* v. *Minnesota,* 283 U. S. 697, was a landmark opinion in this area. It was there that Chief Justice Hughes said for the Court "that liberty of the press, historically considered and taken up by the Federal Constitution, has meant, principally although not exclusively, immunity from previous restraints or censorship." *Id.,* at 716. The dissenters in *Near* sought to uphold the Minnesota statute, struck down by the Court, on the ground that the statute did "not authorize administrative control in advance such as was formerly exercised by the licensers and censors. . . ." *Id.,* at 735. Thus, three decades ago, the Constitution's abhorrence of licensing or censorship was first clearly articulated by this Court.

This was not a tenet seldom considered or soon forgotten. Five years later, a unanimous Court observed:

"As early as 1644, John Milton, in an 'Appeal for the Liberty of Unlicensed Printing,' assailed an act of Parliament which had just been passed providing for censorship of the press previous to publication. He vigorously defended the right of every man to

make public his honest views 'without previous censure'; and declared the impossibility of finding any man base enough to accept the office of censor and at the same time good enough to be allowed to perform its duties." *Grosjean* v. *American Press Co.,* 297 U. S. 233, 245–246.

Shortly thereafter, a unanimous Court once more recalled that the "struggle for the freedom of the press was primarily directed against the power of the licensor." *Lovell* v. *Griffin,* 303 U. S. 444, 451. And two years after this, the Court firmly announced in *Schneider* v. *State,* 308 U. S. 147:

"[T]he ordinance imposes censorship, abuse of which engendered the struggle in England which eventuated in the establishment of the doctrine of the freedom of the press embodied in our Constitution. To require a censorship through license which makes impossible the free and unhampered distribution of pamphlets strikes at the very heart of the constitutional guarantees." *Id.,* at 164.

Just twenty years ago, in the oft-cited case of *Cantwell* v. *Connecticut,* 310 U. S. 296, the Court, again without dissent, decided:

"[T]he availability of a judicial remedy for abuses in the system of licensing still leaves that system one of previous restraint which, in the field of free speech and press, we have held inadmissible. A statute authorizing previous restraint upon the exercise of the guaranteed freedom by judicial decision after trial is as obnoxious to the Constitution as one providing for like restraint by administrative action." *Id.,* at 306.

This doctrine, which was fully explored and which was the focus of this Court's attention on numerous occasions, had become an established principle of constitutional law.

It is not to be disputed that this Court has stated that the protection afforded First Amendment liberties from previous restraint is not absolutely unlimited. *Near* v. *Minnesota, supra.* But, licensing or censorship was not, at any point, considered within the "exceptional cases" discussed in the opinion in *Near. Id.,* at 715–716. And, only a few Terms ago, the Court, speaking through MR. JUSTICE FRANKFURTER, in *Kingsley Books, Inc.,* v. *Brown,* 354 U. S. 436, reaffirmed that "the limitation is the exception; it is to be closely confined so as to preclude what may fairly be deemed *licensing* or *censorship." Id.,* at 441. (Emphasis added.)

The vice of censorship through licensing and, more generally, the particular evil of previous restraint on the right of free speech have many times been recognized when this Court has carefully distinguished between laws establishing sundry systems of previous restraint on the right of free speech and penal laws imposing subsequent punishment on utterances and activities not within the ambit of the First Amendment's protection. See *Near* v. *Minnesota, supra,* at pp. 718–719; *Schneider* v. *State, supra,* at p. 164; *Cantwell* v. *Connecticut, supra,* at p. 306; *Niemotko* v. *Maryland,* 340 U. S. 268, 282 (concurring opinion); *Kunz* v. *New York,* 340 U. S. 290, 294–295.

Examination of the background and circumstances leading to the adoption of the First Amendment reveals the basis for the Court's steadfast observance of the proscription of licensing, censorship and previous restraint of speech. Such inquiry often begins with Blackstone's assertion: "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no previous restraint upon publications, and not in freedom from censure for criminal matter when published." 4 Bl. Comm. (Cooley, 4th ed. 1899) 151. Blackstone probably here referred to the common law's definition of freedom

of the press; [1] he probably spoke of the situation existing in England after the disappearance of the licensing systems but during the existence of the law of crown libels. There has been general criticism of the theory that Blackstone's statement was embodied in the First Amendment, the objection being " 'that the mere exemption from previous restraints cannot be all that is secured by the constitutional provisions'; and that 'the liberty of the press might be rendered a mockery and a delusion, and the phrase itself a by-word, if, while every man was at liberty to publish what he pleased, the public authorities might nevertheless punish him for harmless publications.' 2 Cooley, Const. Lim., 8th ed., p. 885." *Near* v. *Minnesota, supra,* at p. 715; *Grosjean* v. *American Press Co., supra,* at p. 248. The objection has been that Blackstone's definition is too narrow; it had been generally conceded that the protection of the First Amendment extends *at least* to the interdiction of licensing and censorship and to the previous restraint of free speech. *Near* v. *Minnesota, supra,* at p. 715; *Grosjean* v. *American Press Co., supra,* at p. 246; Chafee, Free Speech in the United States, 18.

On June 24, 1957, in *Kingsley Books, Inc.,* v. *Brown, supra,* the Court turned a corner from the landmark opinion in *Near* and from one of the bases of the First Amendment. Today it falls into full retreat.

I hesitate to disagree with the Court's formulation of the issue before us, but, with all deference, I must insist

---

[1] The following charge to the grand jury by Chief Justice Hutchinson of Massachusetts in 1767 defines the common-law notion of freedom of the press:

"The Liberty of the Press is doubtless a very great Blessing; but this Liberty means no more than a Freedom for every Thing to pass from the Press without a License." Quincy, Reports of Cases Argued and Adjudged in the Superior Court of Judicature of the Province of Massachusetts Bay, Between 1761 and 1772, 244.

that the question presented in this case is *not* whether a motion picture exhibitor has a constitutionally protected, "complete and absolute freedom to exhibit, at least once, any and every kind of motion picture." *Ante,* p. 46. Surely, the Court is not bound by the petitioner's conception of the issue or by the more extreme positions that petitioner may have argued at one time in the case. The question here presented is whether the City of Chicago— or, for that matter, any city, any State or the Federal Government—may require all motion picture exhibitors to submit all films to a police chief, mayor or other administrative official, for licensing and censorship prior to public exhibition within the jurisdiction.

The Court does not even have before it an attempt by the city to restrain the exhibition of an allegedly "obscene" film, see *Roth* v. *United States,* 354 U. S. 476. Nor does the city contend that it is seeking to prohibit the showing of a film which will impair the "security of the community life" because it acts as an incitement to "violence and the overthrow by force of orderly government." See *Near* v. *Minnesota, supra,* at p. 716. The problem before us is not whether the city may forbid the exhibition of a motion picture, which, by its very showing, might in some way "inflict injury or tend to incite an immediate breach of the peace." See *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572.

Let it be completely clear what the Court's decision does. It gives official license to the censor, approving a grant of power to city officials to prevent the showing of any moving picture these officials deem unworthy of a license. It thus gives formal sanction to censorship in its purest and most far-reaching form,[2] to a classical plan of

---

[2] Professor Thomas I. Emerson has stated:

"There is, at present, no common understanding as to what constitutes 'prior restraint.' The term is used loosely to embrace a

licensing that, in our country, most closely approaches the English licensing laws of the seventeenth century which were commonly used to suppress dissent in the mother country and in the colonies. Emerson, The Doctrine of Prior Restraint, 20 Law & Contemp. Prob., 648, 667. The Court treats motion pictures, food for the mind, held to be within the shield of the First Amendment, *Joseph Burstyn, Inc.*, v. *Wilson*, 343 U. S. 495, little differently than it would treat edibles. See *Smith* v. *California*, 361 U. S. 147, 152.[3] Only a few days ago, the Court, speaking through MR. JUSTICE STEWART, noted in *Shelton* v. *Tucker*, 364 U. S. 479, 488:

> "In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose."

Here, the Court ignores this considered principle and indiscriminately casts the net of control too broadly. See

---

variety of different situations. Upon analysis, certain broad categories seem to be discernible:

"The clearest form of prior restraint arises in those situations where the government limitation, expressed in statute, regulation, or otherwise, undertakes to prevent future publication or other communication without advance approval of an executive official." Emerson, The Doctrine of Prior Restraint, 20 Law & Contemp. Prob., 648, 655.

See also *Brattle Films, Inc.*, v. *Commissioner of Public Safety*, 333 Mass. 58, 127 N. E. 2d 891.

[3] In *Smith*, we pointed out that although a "strict liability penal ordinance" which does not require scienter may be valid when applied to the distributors of food or drugs, it is invalid when applied to booksellers, distributors of ideas. *Id.*, at 152–153.

*Niemotko* v. *Maryland, supra,* at p. 282 (concurring opinion). By its decision, the Court gives its assent to unlimited censorship of moving pictures through a licensing system, despite the fact that Chicago has chosen this most objectionable course to attain its goals without any apparent attempt to devise other means so as not to intrude on the constitutionally protected liberties of speech and press.

Perhaps the most striking demonstration of how far the Court departs from its holdings in *Near* and subsequent cases may be made by examining the various schemes that it has previously determined to be violative of the First and Fourteenth Amendments' guaranty.

A remarkable parallel to the censorship plan now before the Court, although one less offensive to the First Amendment, is found in the *Near* case itself. The Minnesota statute there under attack did not require that *all* publications be approved before distribution. That statute only provided that a person may be enjoined by a court from publishing a newspaper which was "malicious, scandalous and defamatory." *Id.,* at 702. The injunction in that case was issued only after Near had allegedly published nine such newspapers. The statute permitted issuance of an injunction only on proof that, within the prior three months, such an offensive newspaper had already been published. Near was not prevented "from operating a newspaper in harmony with the public welfare." *Ibid.* If the state court found that Near's subsequent publication conformed to this standard, Near would not have been held in contempt. But, the Court there found that this system of censorship by a state court, used only after it had already been determined that the publisher had previously violated the standard, had to fall before the First and the Fourteenth Amendments. It would seem that, *a fortiori,* the present system must also fall.

The case of *Grosjean* v. *American Press Co., supra,* provides another forceful illustration. The Court held there that a license tax of two percent on the gross receipts from advertising of newspapers and periodicals having a circulation of over 20,000 a week was a form of prior restraint and therefore invalid. Certainly this would seem much less an infringement on the liberties of speech and press protected by the First and Fourteenth Amendments than the classic system of censorship we now have before us. It was held, in *Grosjean,* that the imposition of the tax would curtail the amount of revenue realized from advertising and therefore operate as a restraint on publication. The license tax in *Grosjean* is analogous to the license fee in the case at bar, a fee to which petitioner raises no objection. It was also held, in *Grosjean,* that the tax had a "direct *tendency* . . . to restrict circulation," *id.,* at 244–245 (emphasis added), because it was imposed only on publications with a weekly circulation of 20,000 or more; that "if it were increased to a high degree . . . it *might well result* in destroying both advertising and circulation." *Id.,* at 245. (Emphasis added.) These were the evils calling for reversal in *Grosjean.* I should think that these evils are of minor import in comparison to the evils consequent to the licensing system which the Court here approves.

In *Hague* v. *C. I. O.,* 307 U. S. 496, a city ordinance required that a permit be obtained for public parades or public assembly. The permit could "only be refused for the purpose of preventing riots, disturbances or disorderly assemblage." *Id.,* at 502. Mr. Justice Roberts' opinion said of the ordinance:

> "It enables the Director of Safety to refuse a permit on his mere opinion that such refusal will prevent 'riots, disturbances or disorderly assemblage.' It can thus, as the record discloses, be made the instrument

of arbitrary suppression of free expression of views on national affairs, for the prohibition of all speaking will undoubtedly 'prevent' such eventualities." *Id.*, at 516.

May anything less be said of Chicago's movie censorship plan?

The question before the Court in *Schneider* v. *State, supra,* concerned the constitutional validity of a town ordinance requiring a license for the distribution of circulars. The police chief was permitted to refuse the license if the application for it or further investigation showed "that the canvasser is not of good character or is canvassing for a project not free from fraud. . . ." *Id.*, at 158. The Court said of that ordinance:

"It bans unlicensed communication of any views or the advocacy of any cause from door to door, and permits canvassing only subject to the power of a police officer to determine, as a censor, what literature may be distributed from house to house and who may distribute it. The applicant must submit to that officer's judgment evidence as to his good character and as to the absence of fraud in the 'project' he proposes to promote or the literature he intends to distribute, and must undergo a burdensome and inquisitorial examination, including photographing and fingerprinting. In the end, his liberty to communicate with the residents of the town at their homes depends upon the exercise of the officer's discretion." *Id.*, at 163–164.

I believe that the licensing plan at bar is fatally defective because of this precise objection.

A study of the opinion in *Cantwell* v. *Connecticut, supra,* further reveals the Court's sharp divergence today from seriously deliberated precedent. The statute in

*Cantwell* forbade solicitation for any alleged religious, charitable or philanthropic cause unless the secretary of the public welfare council determined that the "cause [was] a religious one or [was] a bona fide object of charity or philanthropy and conform[ed] to reasonable standards of efficiency and integrity. . . ." *Id.,* at 302. Speaking of the secretary of the public welfare council, the Court held:

> "If he finds that the cause is not that of religion, to solicit for it becomes a crime. He is not to issue a certificate as a matter of course. His decision to issue or refuse it involves appraisal of facts, the exercise of judgment, and the formation of an opinion. He is authorized to withhold his approval if he determines that the cause is not a religious one. Such a censorship of religion as the means of determining its right to survive is a denial of liberty protected by the First Amendment and included in the liberty which is within the protection of the Fourteenth." *Id.,* at 305.

Does the Court today wish to distinguish between the protection accorded to religion by the First and Fourteenth Amendments and the protection accorded to speech by those same provisions? I cannot perceive the distinction between this case and *Cantwell.* Chicago says that it faces a problem—obscene and incendious films. Connecticut faced the problem of fraudulent solicitation. Constitutionally, is there a difference? See also *Largent* v. *Texas,* 318 U. S. 418.

In *Thomas* v. *Collins,* 323 U. S. 516, this Court held that a state statute requiring a labor union organizer to obtain an organizer's card was incompatible with the free speech and free assembly mandates of the First and Fourteenth Amendments. The statute demanded nothing more than that the labor union organizer register, stating his name,

his union affiliations and describing his credentials. This information having been filed, the issuance of the organizer's card was subject to no further conditions. The State's obvious interest in acquiring this pertinent information was felt not to constitute an exceptional circumstance to justify the restraint imposed by the statute. It seems clear to me that the Chicago ordinance in this case presents a greater danger of stifling speech.

The two sound truck cases are further poignant examples of what had been this Court's steadfast adherence to the opposition of previous restraints on First Amendment liberties. In *Saia* v. *New York*, 334 U. S. 558, it was held that a city ordinance which forbade the use of sound amplification devices in public places without the permission of the Chief of Police was unconstitutionally void on its face since it imposed a previous restraint on public speech. Two years later, the Court upheld a different city's ordinance making unlawful the use of "any instrument of any kind or character which emits therefrom loud and raucous noises and is attached to and upon any vehicle operated or standing upon . . . streets or public places. . . ." *Kovacs* v. *Cooper,* 336 U. S. 77, 78. One of the grounds by which the opinion of Mr. Justice Reed distinguished *Saia* was that the *Kovacs* ordinance imposed no previous restraint. *Id.,* at 82. Mr. Justice Jackson chose to differentiate sound trucks from the *"moving picture screen,* the radio, the newspaper, the handbill . . . and the street corner orator. . . ." *Id.,* at 97 (concurring opinion). (Emphasis added.) He further stated that "No violation of the Due Process Clause of the Fourteenth Amendment by reason of infringement of free speech arises unless such regulation or prohibition undertakes to censor the contents of the broadcasting." *Ibid.* Needless to repeat, this is the violation the Court sanctions today.

Another extremely similar, but again less objectionable, situation was brought to the Court in *Kunz* v. *New York,* 340 U. S. 290. There, a city ordinance proscribed the right of citizens to speak on religious matters in the city streets without an annual permit. Kunz had previously had his permit revoked because "he had ridiculed and denounced other religious beliefs in his meetings." *Id.,* at 292.[4] Kunz was arrested for subsequently speaking in the city streets without a permit. The Court reversed Kunz' conviction holding:

> "We have here, then, an ordinance which gives an administrative official discretionary power to control in advance the right of citizens to speak on religious matters on the streets of New York. As such, the ordinance is clearly invalid as a prior restraint on the exercise of First Amendment rights." *Id.,* at 293.

The Chicago censorship and licensing plan is effectively no different. The only meaningful distinction between *Kunz* and the case at bar appears to be in the disposition of them by the Court.

The ordinance before us in *Staub* v. *City of Baxley,* 355 U. S. 313, made unlawful the solicitation, without a permit, of members for an organization which requires the payment of membership dues. The ordinance stated that "In passing upon such application the Mayor and Council shall consider the character of the applicant, the nature of the business of the organization for which members are desired to be solicited, and its effects upon the general welfare of citizens of the City of Baxley." *Id.,* at 315. MR. JUSTICE WHITTAKER, speaking for the Court, stated "that the ordinance is invalid on its face because it makes enjoyment of the constitutionally guaranteed freedom of speech contingent upon the will of the Mayor

---

[4] For the particularly provocative statements made by Kunz, see the dissent of Mr. Justice Jackson. *Id.,* at 296–297.

and Council of the City and thereby constitutes a prior restraint upon, and abridges, that freedom." *Id.,* at 321. In *Staub,* the ordinance required a permit for solicitation; in the case decided today, the ordinance requires a permit for the exhibition of movies. If this is a valid distinction, it has not been so revealed. In *Staub,* the permit was to be granted on the basis of certain indefinite standards; in the case decided today, nothing different may be said.

As the Court recalls, in *Joseph Burstyn, Inc.,* v. *Wilson,* 343 U. S. 495, 502, it was held that motion pictures come "within the free speech and free press guaranty of the First and Fourteenth Amendments." Although the Court found it unnecessary to decide "whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films," *id.,* at 506, Mr. Justice Clark stated, in the Court's opinion, quite accurately:

"But the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary. Those principles, as they have frequently been enunciated by this Court, make freedom of expression the rule. There is no justification in this case for making an exception to that rule.

"The statute involved here does not seek to punish, as a past offense, speech or writing falling within the permissible scope of subsequent punishment. On the contrary, New York requires that permission to communicate ideas be obtained in advance from state officials who judge the content of the words and picture sought to be communicated. This Court recognized many years ago that such a previous restraint is a form of infringement upon freedom of expression to be especially condemned. *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931). The Court there recounted the history which indicates that a major purpose of the First Amendment

guaranty of a free press was to prevent prior restraints upon publication, although it was carefully pointed out that the liberty of the press is not limited to that protection. It was further stated that 'the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases.' *Id.*, at 716. In the light of the First Amendment's history and of the *Near* decision, the State has a heavy burden to demonstrate that the limitation challenged here presents such an exceptional case." *Id.*, at 503–504.

Here, once more, the Court recognized that the First Amendment's rejection of prior censorship through licensing and previous restraint is an inherent and basic principle of freedom of speech and the press. Now, the Court strays from that principle; it strikes down that tenet without requiring any demonstration that this is an "exceptional case," whatever that might be, and without any indication that Chicago has sustained the "heavy burden" which was supposed to have been placed upon it. Clearly, this is neither an exceptional case nor has Chicago sustained *any* burden.

Perhaps today's surrender was forecast by *Kingsley Books, Inc., v. Brown, supra.* But, that was obviously not this case, and accepting *arguendo* the correctness of that decision, I believe that it leads to a result contrary to that reached today. The statute in *Kingsley* authorized "the chief executive, or legal officer, of a municipality to invoke a 'limited injunctive remedy,' under closely defined procedural safeguards, against the sale and distribution of written and printed matter found after due trial [by a court] to be obscene. . . ." *Id.*, at 437. The Chicago scheme has no procedural safeguards; there is no trial of the issue before the blanket injunction against exhibition becomes effective. In *Kingsley,* the grounds for the restraint were that the written or printed matter

was "obscene, lewd, lascivious, filthy, indecent, or disgusting . . . or immoral. . . ." *Id.*, at 438. The Chicago objective is to capture much more. The *Kingsley* statute required the existence of some cause to believe that the publication was obscene before the publication was put on trial. The Chicago ordinance requires no such showing.

The booklets enjoined from distribution in *Kingsley* were concededly obscene.[5] There is no indication that this is true of the moving picture here. This was treated as a particularly crucial distinction. Thus, the Court has suggested that, in times of national emergency, the Government might impose a prior restraint upon "the publication of the sailing dates of transports or the number and location of troops." *Near* v. *Minnesota, supra,* p. 716; cf. *Ex parte Milligan,* 71 U. S. 2. But, surely this is not to suggest that the Government might require that all newspapers be submitted to a censor in order to assist it in preventing such information from reaching print. Yet in this case the Court gives its blessing to the censorship of all motion pictures in order to prevent the exhibition of those it feels to be constitutionally unprotected.

The statute in *Kingsley* specified that the person sought to be enjoined was to be entitled to a trial of the issues within one day after joinder and a decision was to be rendered by the court within two days of the conclusion of the trial. The Chicago plan makes no provi-

---

[5] Judge Stanley H. Fuld rightly observed:

"Whatever might be said of a scheme of advance censorship directed against all *possibly* obscene writings, the case before us concerns a regulatory measure of far narrower impact, of a kind neither entailing the grave dangers of general censorship nor productive of the abuses which gave rise to the constitutional guarantees. (Cf. Pound, Equitable Relief Against Defamation and Injuries to Personality, 29 Harv. L. Rev. 640, 650–51.)" *Brown* v. *Kingsley Books, Inc.,* 1 N. Y. 2d 177, 185, 134 N. E. 2d 461, 465.

sion for prompt judicial determination. In *Kingsley,* the person enjoined had available the defense that the written or printed matter was not obscene if an attempt was made to punish him for disobedience of the injunction. The Chicago ordinance admits no defense in a prosecution for failure to procure a license other than that the motion picture was submitted to the censor and a license was obtained.

Finally, the Court in *Kingsley* painstakingly attempted to establish that that statute, in its effective operation, was no more a previous restraint on, or interference with, the liberty of speech and press than a statute imposing criminal punishment for the publication of pornography. In each situation, it contended, the publication may have passed into the hands of the public. Of course, this argument is inadmissible in this case and the Court does not purport to advance it.

It would seem idle to suppose that the Court today is unaware of the evils of the censor's basic authority, of the mischief of the system against which so many great men have waged stubborn and often precarious warfare for centuries, see *Grosjean* v. *American Press Co., supra,* at p. 247, of the scheme that impedes all communication by hanging threateningly over creative thought.[6] But the Court dismisses all of this simply by opining that "the phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test." *Ante,* p. 49. I must insist that "a pragmatic assessment of its operation,"

---

[6] Tolstoy once wrote:

"You would not believe how, from the very commencement of my activity, that horrible Censor question has tormented me! I wanted to write what I felt; but all the same time it occurred to me that what I wrote would not be permitted, and involuntarily I had to abandon the work. I abandoned, and went on abandoning, and meanwhile the years passed away." Quoted by Chafee, *supra,* at p. 241.

*Kingsley Books, Inc.,* v. *Brown, supra,* at p. 442, lucidly portrays that the system that the Court sanctions today is inherently bad. One need not disagree with the Court that Chicago has chosen the most effective means of suppressing obscenity. Censorship has been so recognized for centuries. But, this is not to say that the Chicago plan, the old, abhorrent English system of censorship through licensing, is a permissible *form* of prohibiting unprotected speech. The inquiry, as stated by the Court but never resolved, is whether this form of prohibition results in "unreasonable strictures on individual liberty," *ante,* p. 50; [7] whether licensing, as a prerequisite to exhibition, is barred by the First and Fourteenth Amendments.

A most distinguished antagonist of censorship, in "a plea for unlicensed printing," has said:

> "If he [the censor] be of such worth as behoovs him, there cannot be a more tedious and unpleasing Journey-work, a greater loss of time levied upon his head, then to be made the perpetuall reader of unchosen books and pamphlets . . . we may easily forsee what kind of licensers we are to expect hereafter, either ignorant, imperious, and remisse, or basely pecuniary." Areopagitica, in the Complete Poetry and Selected Prose of John Milton (Modern Library College Ed. 1950), 677, at 700.

There is no sign that Milton's fear of the censor would be dispelled in twentieth century America. The censor is beholden to those who sponsored the creation of his office,

---

[7] In *Smith* v. *California, supra,* we noted that "Our decisions furnish examples of legal devices and doctrines, in most applications consistent with the Constitution, which cannot be applied in settings where they have the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it." *Id.,* at 150–151. See *Shelton* v. *Tucker, supra.* Forty-six of our States currently see fit to rely on traditional criminal punishment for the protection of their citizens.

to those who are most radically preoccupied with the suppression of communication. The censor's function is to restrict and to restrain; his decisions are insulated from the pressures that might be brought to bear by public sentiment if the public were given an opportunity to see that which the censor has curbed.

The censor performs free from all of the procedural safeguards afforded litigants in a court of law. See *Kingsley Books, Inc.*, v. *Brown, supra,* at p. 437; cf. *Near* v. *Minnesota, supra,* at p. 713; *Cantwell* v. *Connecticut, supra,* at p. 306. The likelihood of a fair and impartial trial disappears when the censor is both prosecutor and judge. There is a complete absence of rules of evidence; the fact is that there is usually no evidence at all as the system at bar vividly illustrates.[8] How different from a judicial proceeding where a full case is presented by the litigants. The inexistence of a jury to determine con-

---

[8] Although the Chicago ordinance designates the Commissioner of Police as the censor, counsel for the city explained that the task is delegated to a group of people, often women. The procedure before Chicago's censor board was found to be as follows according to the testimony of the "commanding officer of the censor unit":

"Q. Am I to understand that the procedure is that only these six people are in the room, and perhaps you, at the time the film is shown?

"A. Yes.

"Q. Does the distributor ever get a chance to present his views on the picture?

"A. No, sir.

"Q. Are other people's views invited, such as drama critics or movie reviewers or writers or artists of some kind; or are they ever asked to comment on the film before the censor board makes its decision?

"A. No, sir.

"Q. In other words, it is these six people plus yourself in a relationship that we have not as yet defined who decide whether the picture conforms to the standards set up in the ordinance?

"A. Yes, sir." Transcript of Record, p. 51, *Times Film Corp.* v. *City of Chicago,* 244 F. 2d 432.

temporary community standards is a vital flaw.[9] See *Kingsley Books, Inc.,* v. *Brown, supra,* at pp. 447–448 (dissenting opinion).

A revelation of the extent to which censorship has recently been used in this country is indeed astonishing. The Chicago licensors have banned newsreel films of Chicago policemen shooting at labor pickets and have ordered the deletion of a scene depicting the birth of a buffalo in Walt Disney's *Vanishing Prairie.* Gavzer, Who Censors Our Movies? Chicago Magazine, Feb. 1956, pp. 35, 39. Before World War II, the Chicago censor denied licenses to a number of films portraying and criticizing life in Nazi Germany including the March of Time's *Inside Nazi Germany.* Editorials, Chicago Daily Times, Jan. 20, Nov. 18, 1938. Recently, Chicago refused to issue a permit for the exhibition of the motion picture *Anatomy of a Murder* based upon the best-selling novel of the same title, because it found the use of the words "rape" and "contraceptive" to be objectionable. *Columbia Pictures Corp.* v. *City of Chicago* (D. C. N. D. Ill.), 59 C. 1058 (1959) (unreported). The Chicago censor bureau excised a scene in *Street With No Name* in which a girl was slapped

---

[9] Cf. Chafee, *supra:*

"A jury is none too well fitted to pass on the injurious nature of opinions, but at least it consists of twelve men who represent the general views and the common sense of the community and often appreciate the motives of the speaker or writer whose punishment is sought. A censor, on the contrary, is a single individual with a professionalized and partisan point of view. His interest lies in perpetuating the power of the group which employs him, and any bitter criticism of the group smacks to him of incitement to bloody revolution." *Id.,* at 314.

"On the other hand, a mayor and a police commissioner are not ordinarily selected on the basis of wide reading and literary judgment. They have other duties, which require other qualities. They may lack the training of the permanent censor, and yet run the same risk of being arbitrary and bureaucratic." *Id.,* at 533.

because this was thought to be a "too violent" episode. Life, Oct. 25, 1948, p. 60. *It Happened in Europe* was severely cut by the Ohio censors who deleted scenes of war orphans resorting to violence. The moral theme of the picture was that such children could even then be saved by love, affection and satisfaction of their basic needs for food. Levy, Case Against Film Censorship, Films in Review, Apr. 1950, p. 40 (published by National Board of Review of Motion Pictures, Inc.). The Memphis censors banned *The Southerner* which dealt with poverty among tenant farmers because "it reflects on the south." *Brewster's Millions,* an innocuous comedy of fifty years ago, was recently forbidden in Memphis because the radio and film character Rochester, a Negro, was deemed "too familiar." See Velie, You Can't See That Movie: Censorship in Action, Collier's, May 6, 1950, pp. 11, 66. Maryland censors restricted a Polish documentary film on the basis that it failed to present a true picture of modern Poland. Levy, Case Against Film Censorship, Films in Review, *supra,* p. 41. *No Way Out,* the story of a Negro doctor's struggle against race prejudice, was banned by the Chicago censor on the ground that "there's a possibility it could cause trouble." The principal objection to the film was that the conclusion showed no reconciliation between blacks and whites. The ban was lifted after a storm of protest and later deletion of a scene showing Negroes and whites arming for a gang fight. N. Y. Times, Aug. 24, 1950, p. 31, col. 3; Aug. 31, 1950, p. 20, col. 8. Memphis banned *Curley* because it contained scenes of white and Negro children in school together. Kupferman and O'Brien, Motion Picture Censorship—The Memphis Blues, 36 Cornell L. J. 273, 276–278. Atlanta barred *Lost Boundaries,* the story of a Negro physician and his family who "passed" for white, on the ground that the exhibition of said picture "will adversely affect the peace, morals and good order" in the

city.   N. Y. Times, Feb. 5, 1950, § 2, p. 5, col. 7.   See generally Kupferman and O'Brien, *supra;* Note, 60 Yale L. J. 696 *et seq.;* Brief for American Civil Liberties Union as *amicus curiae,* pp. 14–15.   *Witchcraft,* a study of superstition through the ages, was suppressed for years because it depicted the devil as a genial rake with amorous leanings, and because it was feared that certain historical scenes, portraying the excesses of religious fanatics, might offend religion.   *Scarface,* thought by some as the best of the gangster films, was held up for months; then it was so badly mutilated that retakes costing a hundred thousand dollars were required to preserve continuity.   The New York censors banned *Damaged Lives,* a film dealing with venereal disease, although it treated a difficult theme with dignity and had the sponsorship of the American Social Hygiene Society.   The picture of Lenin's tomb bearing the inscription "Religion is the opiate of the people" was excised from *Potemkin.* From *Joan of Arc* the Maryland board eliminated Joan's exclamation as she stood at the stake: "Oh, God, why hast thou forsaken me?" and from *Idiot's Delight,* the sentence: "We, the workers of the world, will take care of that."   *Professor Mamlock* was produced in Russia and portrayed the persecution of the Jews by Nazis.   The Ohio censors condemned it as "harmful" and calculated to "stir up hatred and ill will and gain nothing."   It was released only after substantial deletions were made.   The police refused to permit its showing in Providence, Rhode Island, on the ground that it was communistic propaganda.   *Millions of Us,* a strong union propaganda film, encountered trouble in a number of jurisdictions.   *Spanish Earth,* a pro-Loyalist documentary picture, was banned by the board in Pennsylvania.   Ernst and Lindey, The Censor Marches On, 96–97, 102–103, 108–111.   During the year ending June 30, 1938, the New York board censored, in one way or another, over five percent of the

moving pictures it reviewed. *Id.,* at 81. Charlie Chaplin's satire on Hitler, *The Great Dictator,* was banned in Chicago, apparently out of deference to its large German population. Chafee, *supra,* at p. 541. Ohio and Kansas banned newsreels considered pro labor. Kansas ordered a speech by Senator Wheeler opposing the bill for enlarging the Supreme Court to be cut from the *March of Time* as "partisan and biased." *Id.,* at 542. An early version of *Carmen* was condemned on several different grounds. The Ohio censor objected because cigarette-girls smoked cigarettes in public. The Pennsylvania censor disapproved the duration of a kiss. *Id.,* at 543. The New York censors forbade the discussion in films of pregnancy, venereal disease, eugenics, birth control, abortion, illegitimacy, prostitution, miscegenation and divorce. Ernst and Lindey, *supra,* at p. 83. A member of the Chicago censor board explained that she rejected a film because "it was immoral, corrupt, indecent, against my . . . religious principles." Transcript of Record, p. 172. *Times Film Corp.* v. *City of Chicago,* 244 F. 2d 432. A police sergeant attached to the censor board explained, "Coarse language or anything that would be derogatory to the government— propaganda" is ruled out of foreign films. "Nothing pink or red is allowed," he added. Chicago Daily News, Apr. 7, 1959; p. 3, cols. 7–8. The police sergeant in charge of the censor unit has said: "Children should be allowed to see any movie that plays in Chicago. If a picture is objectionable for a child, it is objectionable period." Chicago Tribune, May 24, 1959, p. 8. col. 3. And this is but a smattering produced from limited research. Perhaps the most powerful indictment of Chicago's licensing device is found in the fact that between the Court's decision in 1952 in *Joseph Burstyn, Inc.,* v. *Wilson, supra,* and the filing of the petition for certiorari in 1960 in the present case, not once have the state courts upheld the censor

when the exhibitor elected to appeal.    Brief of American Civil Liberties Union as *amicus curiae,* pp. 13–14.

This is the regimen to which the Court holds that all films must be submitted.   It officially unleashes the censor and permits him to roam at will, limited only by an ordinance which contains some standards that, although concededly not before us in this case, are patently imprecise. The Chicago ordinance commands the censor to reject films that are "immoral," see *Commercial Pictures Corp.* v. *Regents,* 346 U. S. 587; *Kingsley International Pictures Corp.* v. *Regents,* 360 U. S. 684; or those that portray "depravity, criminality, or lack of virtue of a class of citizens of any race, color, creed, or religion and [expose] them to contempt, derision or obloquy, or [tend] to produce a breach of the peace or riots, or [purport] to represent any hanging, lynching, or burning of a human being." May it not be said that almost every censored motion picture that was cited above could also be rejected, under the ordinance, by the Chicago censors?   It does not require an active imagination to conceive of the quantum of ideas that will surely be suppressed.

If the censor denies rights protected by the First and Fourteenth Amendments, the courts might be called upon to correct the abuse if the exhibitor decides to pursue judicial remedies.   But, this is not a satisfactory answer as emphasized by this very case.   The delays in adjudication may well result in irreparable damage, both to the litigants and to the public.   Vindication by the courts of *The Miracle* was not had until five years after the Chicago censor refused to license it.   And then the picture was never shown in Chicago.   Brief for Petitioner, p. 17.   The instant litigation has now consumed almost three years. This is the delay occasioned by the censor; this is the injury done to the free communication of ideas.   This damage is not inflicted by the ordinary criminal penalties,

The threat of these penalties, intelligently applied, will ordinarily be sufficient to deter the exhibition of obscenity. However, if the exhibitor believes that his film is constitutionally protected, he will show the film, and, if prosecuted under criminal statute, will have ready that defense. The perniciousness of a system of censorship is that the exhibitor's belief that his film is constitutionally protected is irrelevant. Once the censor has made his estimation that the film is "bad" and has refused to issue a permit, there is ordinarily no defense to a prosecution [10] for showing the film without a license.[11] Thus, the film is not shown, perhaps not for years and sometimes not ever. Simply a talismanic test or self-wielding sword? I think not.

Moreover, more likely than not, the exhibitor will not pursue judicial remedies. See *Schneider* v. *State, supra,* at p. 164; Ernst and Lindey, *supra,* at p. 80. His inclination may well be simply to capitulate rather than initiate a lengthy and costly litigation.[12] In such case, the liberty

---

[10] That portion of the Chicago ordinance dealing with penalties is as follows:

"Any person exhibiting any pictures or series of pictures without a permit having been obtained therefor shall be fined not less than fifty dollars nor more than one hundred dollars for each offense. A separate and distinct offense shall be regarded as having been committed for each day's exhibition of each picture or series of pictures without a permit."

[11] Professor Paul A. Freund has affirmed that this situation "does indeed have a chilling effect (on freedom of communication) beyond that of a criminal statute." Freund, The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533, 539.

[12] A particularly frightening illustration is found in the operation of a Detroit book censorship plan. One publisher simply submitted his unprinted manuscripts to the censor and deleted everything "objectionable" before publication. From 1950 to 1952, more than 100 titles of books were disapproved by the censor board. Every book banned was withheld from circulation. The censor board, in addition to finding books "objectionable," listed a group of books not

of speech and press, and the public, which benefits from the shielding of that liberty, are, in effect, at the mercy of the censor's whim. This powerful tendency to restrict the free dissemination of ideas calls for reversal. See *Grosjean* v. *American Press Co., supra,* at 245.

Freedom of speech and freedom of the press are further endangered by this "most effective" means for confinement of ideas. It is axiomatic that the stroke of the censor's pen or the cut of his scissors will be a less contemplated decision than will be the prosecutor's determination to prepare a criminal indictment. The standards of proof, the judicial safeguards afforded a criminal defendant and the consequences of bringing such charges will all provoke the mature deliberation of the prosecutor. None of these hinder the quick judgment of the censor, the speedy determination to suppress. Finally, the fear of the censor by the composer of ideas acts as a substantial deterrent to the creation of new thoughts. See Tolstoy's declaration, note 6, *supra.* This is especially true of motion pictures due to the large financial burden that must be assumed by their producers. The censor's sword pierces deeply into the heart of free expression.

It seems to me that the Court's opinion comes perilously close to holding that not only may motion pictures be censored but that a licensing scheme may also be applied to newspapers, books and periodicals, radio, television, public speeches, and every other medium of expression. The Court suggests that its decision today is limited to motion pictures by asserting that they are not "necessarily subject to the precise rules governing any other particular method of expression. Each method . . .

---

suitable for criminal prosecution as "partially objectionable." Most booksellers were also afraid to handle these. Lockhart and McClure, Literature, The Law of Obscenity, and the Constitution, 38 Minn. L. Rev. 295, 314–316.

tends to present its own peculiar problems." *Ante,* p. 49. But, this, I believe, is the invocation of a talismanic phrase. The Court, in no way, explains why moving pictures should be treated differently than any other form of expression, why moving pictures should be denied the protection against censorship—"a form of infringement upon freedom of expression to be *especially* condemned." *Joseph Burstyn, Inc.,* v. *Wilson, supra,* at p. 503. (Emphasis added.) When pressed during oral argument, counsel for the city could make no meaningful distinction between the censorship of newspapers and motion pictures. In fact, the percentage of motion pictures dealing with social and political issues is steadily rising.[13] The Chicago ordinance makes no exception for newsreels, documentaries, instructional and educational films or the like. All must undergo the censor's inquisition. Nor may it be suggested that motion pictures may be treated differently from newspapers because many movies are produced essentially for purposes of entertainment. As the Court said in *Winters* v. *New York,* 333 U. S. 507, 510:

"We do not accede to appellee's suggestion that the constitutional protection for a free press applies only to the exposition of ideas. The line between the informing and the entertaining is too elusive for the protection of that basic right. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine." See *Thomas* v. *Collins, supra,* at p. 531.[14]

---

[13] See Note, 60 Yale L. J. 696, 706, n. 25.

[14] "The evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." 2 Cooley, Const. Lim. (8th ed.), p. 886.

The contention may be advanced that the impact of motion pictures is such that a licensing system of prior censorship is permissible. There are several answers to this, the first of which I think is the Constitution itself. Although it is an open question whether the impact of motion pictures is greater or less than that of other media, there is not much doubt that the exposure of television far exceeds that of the motion picture. See S. Rep. No. 1466, 84th Cong., 2d Sess. 5. But, even if the impact of the motion picture is greater than that of some other media, that fact constitutes no basis for the argument that motion pictures should be subject to greater suppression. This is the traditional argument made in the censor's behalf; this is the argument advanced against newspapers at the time of the invention of the printing press. The argument was ultimately rejected in England, and has consistently been held to be contrary to our Constitution. No compelling reason has been predicated for accepting the contention now.

It is true that "each method [of expression] tends to present its own peculiar problems." *Joseph Burstyn, Inc.,* v. *Wilson, supra,* at p. 503. The Court has addressed itself on several occasions to these problems. In *Schneider* v. *State, supra,* at pp. 160–161, the Court stated, in reference to speaking in public, that "a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets." The Court recognized that sound trucks call for particu-

larized consideration when it said in *Saia* v. *New York, supra,* at p. 562, "Noise can be regulated by regulating decibels. The hours and place of public discussion can be controlled. . . . Any abuses which loud-speakers create can be controlled by narrowly drawn statutes." But, the Court's decision today does not follow from this. Our prior decisions do not deal with the *content* of the speech; they deal only with the conditions surrounding its delivery. *These* conditions "tend to present the problems peculiar to each method of expression." Here the Court uses this magical phrase to cripple a basic principle of the Constitution.

The Court, not the petitioner, makes the "broadside attack." I would reverse the decision below.

Mr. Justice Douglas, with whom The Chief Justice and Mr. Justice Black concur, dissenting.

My view that censorship of movies is unconstitutional because it is a prior restraint and violative of the First Amendment has been expressed on prior occasions. *Superior Films* v. *Department of Education,* 346 U. S. 587, 588–589 (concurring opinion); *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684, 697 (concurring opinion).

While the problem of movie censorship is relatively new, the censorship device is an ancient one. It was recently stated, "There is a law of action and reaction in the decline and resurgence of censorship and control. Whenever liberty is in the ascendant, a social group will begin to resist it; and when the reverse is true, a similar resistance in favor of liberty will occur." Haney, Comstockery in America (1960), pp. 11–12.

Whether or not that statement of history is accurate, censorship has had many champions throughout time.

Socrates: "And shall we just carelessly allow children to hear any casual tales which may be devised by casual per-

sons, and to receive into their minds ideas for the most part the very opposite of those which we should wish them to have when they are grown up?"

Glaucon: "We can not."

Socrates: "Then the first thing will be to establish a censorship of the writers of fiction, and let the censors receive any tale of fiction which is good, and reject the bad; and we will desire mothers and nurses to tell their children the authorized ones only. Let them fashion the mind with such tales, even more fondly than they mould the body with their hands; but most of those which are now in use must be discarded." Plato, Republic (The Dialogues of Plato, Jowett trans., Ox. Univ. Press, 1953) vol. 2, p. 221.

Hobbes was the censor's proponent: ". . . it is annexed to the sovereignty, to be judge of what opinions and doctrines are averse, and what conducing to peace; and consequently, on what occasions, how far, and what men are to be trusted withal, in speaking to multitudes of people; and who shall examine the doctrines of all books before they be published. For the actions of men proceed from their opinions; and in the well-governing of opinions, consisteth the well-governing of men's actions, in order to their peace, and concord." Leviathan (Oakeshott ed. 1947), p. 116.

Regimes of censorship are common in the world today. Every dictator has one; every Communist regime finds it indispensable.[1] One shield against world opinion that colonial powers have used was the censor, as dramatized by France in North Africa. Even England has a vestige of censorship in the Lord Chamberlain (32 Halsbury's Laws of England (2d ed. 1939), p. 68) who presides over the stage—a system that in origin was concerned with the

---

[1] "Nowhere have the Communists become simply a vote-getting party. They are organized around ideas and they care about ideas. They are the great heresy hunters of the modern world." Ways, Beyond Survival (1959), p. 199.

barbs of political satire.[2]   But the concern with political satire shifted to a concern with atheism and with sexual morality—the last being the concern evident in Chicago's system now before us.

The problems of the wayward mind concern the clerics, the psychiatrists, and the philosophers.   Few groups have hesitated to create the political pressures that translate into secular law their notions of morality.   Pfeffer, Creeds in Competition (1958), pp. 103–109.   No more powerful weapon for sectarian control can be imagined than governmental censorship.   Yet in this country the state is not the secular arm of any religious school of thought, as in some nations; nor is the church an instrument of the state.   Whether—as here—city officials or—as in Russia—a political party lays claim to the power of governmental censorship, whether the pressures are for a conformist moral code or for a conformist political ideology, no such regime is permitted by the First Amendment.

---

[2] Ivor Brown in a recent summary of the work of the Lord Chamberlain states: "The licensing of plays was imposed not to protect the morals of the British public but to safeguard the reputation of politicians.   This happened in 1737 when the Prime Minister, Sir Robert Walpole, infuriated by the stage lampoons of Henry Fielding and others, determined to silence these much enjoyed exposures of his alleged corruption and incompetence.   This had the curiously beneficial result of driving Fielding away from the stage.   He then became an excellent magistrate and a major creator of the English novel.   But in the puritanical atmosphere of the nineteenth century the discipline was applied to the moral content of plays and applied so rigorously that the dramatists were barred from serious treatment of 'straight sex,' as well as the abnormalities.   The prissiness of respectable Victorian society was such that legs were hardly to be mentioned, let alone seen, and Charles Dickens wrote cumbrously of 'unmentionables' when he meant trousers."   N. Y. Times, Jan. 1, 1961, § 2, p. X3.   And see Knowles, The Censor, The Drama, and The Film (1934).   As to British censorship of movies see 15 & 16 Geo. 6 & 1 Eliz. 2, c. 68.  .

The forces that build up demands for censorship are heterogeneous.

> "The comstocks are not merely people with intellectual theories who might be convinced by more persuasive theories; nor are they pragmatists who will be guided by the balance of power among pressure groups. Many of them are so emotionally involved in the condemnation of what they find objectionable that they find rational arguments irrelevant. They *must* suppress what is offensive in order to stabilize their own tremulous values and consciences. Panic rules them, and they cannot be calmed by discussions of legal rights, literary integrity, or artistic merit." Haney, *op. cit. supra,* pp. 176–177.

Yet as long as the First Amendment survives, the censor, no matter how respectable his cause, cannot have the support of government. It is not for government to pick and choose according to the standards of any religious, political, or philosophical group. It is not permissible, as I read the Constitution, for government to release one movie and refuse to release another because of an official's concept of the prevailing need or the public good. The Court in *Near* v. *Minnesota,* 283 U. S. 697, 713, said that the "chief purpose" of the First Amendment's guarantee of freedom of press was "to prevent previous restraints upon publication."

A noted Jesuit has recently stated one reason against government censorship:

> "The freedom toward which the American people are fundamentally orientated is a freedom under God, a freedom that knows itself to be bound by the imperatives of the moral law. Antecedently it is presumed that a man will make morally and socially responsible use of his freedom of expression; hence there is to be no prior restraint on it. However, if

his use of freedom is irresponsible, he is summoned after the fact to responsibility before the judgment of the law. There are indeed other reasons why prior restraint on communications is outlawed; but none are more fundamental than this." Murray, We Hold These Truths (1960), pp. 164–165.

Experience shows other evils of "prior restraint." The regime of the censor is deadening. One who writes cannot afford entanglements with the man whose pencil can keep his production from the market. The result is a pattern of conformity. Milton made the point long ago: "For though a licenser should happen to be judicious more than ordinarily, which will be a great jeopardy of the next succession, yet his very office, and his commission enjoins him to let pass nothing but what is vulgarly received already." Areopagitica, 3 Harvard Classics (1909), p. 212.

Another evil of censorship is the ease with which the censor can erode liberty of expression. One stroke of the pen is all that is needed. Under a censor's regime the weights are cast against freedom.[3] If, however, gov-

---

[3] John Galsworthy wrote in opposition to the British censorship of plays: "In this country the tongue and pen are subject to the law; so may it ever be! But in this country neither tongue nor pen are in any other instance subject to the despotic judgments of a single man. The protest is not aimed at the single man who holds this office. He may be the wisest man in England, the best fitted for his despotic office. It is not he; it is the office that offends. It offends the decent pride and self-respect of an entire profession. To those who are surprised that dramatic authors should take themselves so seriously we say, What workman worthy of his tools does not believe in the honour of his craft? In this appeal for common justice we dramatists, one little branch of the sacred tree of letters, appeal to our brother branches. We appeal to the whole knighthood of the pen—scientists, historians, novelists, journalists. The history of the health of nations is the history of the freedom—not the licence—of the tongue and pen. We are claiming the freedom—not the licence— of our pens. Let those hold back in helping us who would tamely

ernment must proceed against an illegal publication in a prosecution, then the advantages are on the other side. All the protections of the Bill of Rights come into play. The presumption of innocence, the right to jury trial, proof of guilt beyond a reasonable doubt—these become barriers in the path of officials who want to impose their standard of morality on the author or producer. The advantage a censor enjoys while working as a supreme bureaucracy disappears. The public trial to which a person is entitled who violates the law gives a hearing on the merits, airs the grievance, and brings the community judgment to bear upon it. If a court sits in review of a censor's ruling, its function is limited. There is leeway left the censor, who like any agency and its *expertise*, is given a presumption of being correct.[4] That advantage

suffer their own pens to be warped and split as ours are before we take them up." London Times, Nov. 1, 1907, p. 7. And see the testimony of George Bernard Shaw in Report, Joint Select Committee of the House of Lords and the House of Commons on the Stage Plays (Censorship) (1909), p. 46 *et seq.* Shaw, three of whose plays had been suppressed, caused a contemporary sensation by asking, and being refused, permission to file with the Committee an attack on censorship that he had prepared. Shaw's version of the story and the rejected statement can be found as his preface to The Shewing-Up of Blanco Posnet. He says in his statement: "Any journalist may publish an article, any demagogue may deliver a speech without giving notice to the government or obtaining its license. The risk of such freedom is great; but as it is the price of our political liberty, we think it worth paying. We may abrogate it in emergencies . . . just as we stop the traffic in a street during a fire or shoot thieves on sight after an earthquake. But when the emergency is past, liberty is restored everywhere except in the theatre. [Censorship is] a permanent proclamation of martial law with a single official substituted for a court martial." The Shewing-Up of Blanco Posnet (Brentano's, 1913), p. 36.

[4] See Note, 71 Harv. L. Rev. 326, 331. Cf. *Glanzman* v. *Christenberry*, 175 F. Supp. 485, with *Grove Press, Inc.*, v. *Christenberry*, 175 F. Supp. 488, as to the weight given to post-office determinations of nonmailability.

84

disappears when the government must wait until a publication is made and then prove its case in the accepted manner before a jury in a public trial. All of this is anathema to the censor who prefers to work in secret, perhaps because, as Milton said, he is "either ignorant, imperious, and remiss, or basely pecuniary." *Areopagitica, supra*, p. 210.

The First Amendment was designed to enlarge, not to limit, freedom in literature and in the arts as well as in politics, economics, law, and other fields. *Hannegan* v. *Esquire, Inc.*, 327 U. S. 146, 151–159; *Kingsley Pictures Corp.* v. *Regents, supra*. Its aim was to unlock all ideas for argument, debate, and dissemination. No more potent force in defeat of that freedom could be designed than censorship. It is a weapon that no minority or majority group, acting through government, should be allowed to wield over any of us.[5]

---

[5] "First, within the larger pluralist society each minority group has the right to censor for its own members, if it so chooses, the content of the various media of communication, and to protect them, by means of its own choosing, from materials considered harmful according to its own standards.

"Second, in a pluralist society no minority group has the right to demand that government should impose a general censorship, affecting all the citizenry, upon any medium of communication, with a view to punishing the communication of materials that are judged to be harmful according to the special standards held within one group.

"Third, any minority group has the right to work toward the elevation of standards of public morality in the pluralist society, through the use of the methods of persuasion and pacific argument.

"Fourth, in a pluralist society no minority group has the right to impose its own religious or moral views on other groups, through the use of the methods of force, coercion, or violence." Murray, We Hold These Truths (1960), p. 168.