GROVE PRESS, INC., a New York Corp.

v.

Melvin BAILEY, Sheriff of Jefferson County, Alabama, David Orange, Deputy Sheriff of Jefferson County, Alabama, Earl Morgan, District Attorney of Jefferson County, Alabama, Harry Pickens, Deputy District Attorney of Jefferson County, Ala., and Jay W. Morris, Chief of Police of the City of Midfield, Ala.

Civ. A. No. 69–770.

United States District Court,
N. D. Alabama, S. D.

Aug. 14, 1970.

Douglas Corretti, Corretti, Newsom, Rogers & May, Birmingham, Ala., H. Powell Lipscomb, Lipscomb & Lipscomb, Bessemer, Ala., for plaintiff.

Norman K. Brown, Harry E. Pickens, Bessemer, Ala., for defendants.

Before RIVES, Circuit Judge, and ALLGOOD and McFADDEN, District Judges.

## MEMORANDUM OPINION

### PER CURIAM.

This cause is before the Court upon petition of plaintiff for declaratory judgment and injunctive relief. The jurisdiction of this Court is based upon diversity of citizenship and a federal question.

The events which led to the filing of this petition are as follows: On November 21, 1969, plaintiff's motion picture film, "I Am Curious (Yellow)", was being shown for the first time in the State of Alabama at the Midfield Theatre in Midfield, Alabama, by its licensee Halmark Cinemas of Birmingham, Inc. This motion picture had been booked into the Midfield Theatre by the licensee to be exhibited therein on November 21, 1969 and for an indefinite period of time thereafter. At 2:00 P.M. on November 21, 1969, the time scheduled for the first exhibition, a number of uniformed and plain-clothes law enforcement officers of Jefferson County, Alabama, including the defendants, entered the Midfield Theatre—some of them paying the regular admission charge, and some of them requesting to be admitted on passes—and viewed the motion picture film "I Am Curious (Yellow)". Approximately 45 minutes after completion of the first showing one of the defendants, Sheriff Melvin Bailey, Sheriff of Jefferson County, Alabama, stated to Mrs. Kathryn C. Cooper, Manager of the Midfield Theatre, that if the motion picture "I Am Curious (Yellow)" was exhibited at the next scheduled showing, 7:30 P.M., that she

would be placed under arrest for violation of the State of Alabama's newly enacted obscenity law, Act No. 698, p. 1252,[1] passed by the last regular session of the 1969 Alabama Legislature. Simultaneously, Mrs. Cooper was served by defendants Sheriff Melvin Bailey and Harry Pickens, Deputy District Attorney of Jefferson County, Alabama, with their respective written notices, as required under Section 4 of Act No. 698, which stated in substance that after having viewed the motion picture "I Am Curious (Yellow)" it was their opinion that the movie was obscene, and that further showings thereof would constitute a violation of Act No. 698 for which arrests would be made. Section 4 of Act No. 698 reads in its entirety as follows:

Section 4. (a) No prosecution may be commenced against any person for violating Sections 2 and 3 of this Act unless the accused is first served with prior written notice that there is reasonable cause to believe the material upon which such prosecution is based violates this Act, and the accused has, after receiving such notice violated this Act.

(b) The written notice provided for in paragraph (a) of this Section 4 may be given by only the following officials: the State Attorney General and any Assistant Attorney General; the district attorney, county solicitor, their assistants and deputies, or any person whose office and duty is to prosecute criminal actions before any state, county or municipal court; the sheriff; the chief of police of any municipality or town; and the duly authorized law enforcement employees of the Department of Public Safety.

(c) Any person receiving such written notice provided for in paragraph (a) of this Section 4 shall have the right within 30 days from such notice to file an appropriate action for declaratory judgment to determine the validity of such written notice, but no

1. Set forth in full as Appendix A to this Opinion.

such action shall, by reason of the commencement thereof, stay or in any way delay or postpone any prosecution for the violation of this Act.

Upon receipt of these notices, Mrs. Cooper discontinued further exhibition of the motion picture during the remainder of that day.

The following day, Mrs. Cooper filed a bill of complaint in the Circuit Court of the Tenth Judicial Circuit of Alabama, Bessemer Division, In Equity, seeking a temporary Writ of Injunction restraining the defendants herein and all persons acting in concert with them from arresting the complainant or any of the employees of Midfield Theatre for exhibiting the motion picture film "I Am Curious (Yellow)." On the day of filing, the Circuit Court granted the temporary Writ of Injunction and dissolved it four days later on November 26, 1969. The Court in its decree stated:

> * * * the Court, having looked at and viewed this picture film (I Am Curious Yellow), the Court is of the opinion that [respondents] Motion to Dissolve and Motion to Discharge should be granted and it is the opinion of the Court that the movie is obscene according to the community standards of the Bessemer Division of the County.

That same day plaintiff herein filed this action.

On December 15th and 17th the matter was set down for special hearing before a single judge, McFadden, J., of this Court, on plaintiff's application for a temporary restraining order pending the impaneling of the requested three-judge court. Having received the testimony of the parties the Court entered the following order:

> It is ORDERED that the prayer of the plaintiff for such restraining order be, and the same is hereby, denied. However, plaintiff is entitled to have possession of its property, the film, and the defendants are hereby directed not to interfere with the peaceful possession of said film by the plaintiff.

> Plaintiff is hereby directed not to make any alterations, changes, deletions or additions to said film and to preserve it intact for production on the order of the Court.

The case was then set down for hearing on February 2, 1970, before this three-judge court.

The jurisdiction of this Court is invoked pursuant to Tit. 42 U.S.C. § 1983, Tit. 28 U.S.C. §§ 1331, 1332, 1343 and 1343(4), and Tit. 28 U.S.C. § 2281, et seq.

## INJUNCTIVE RELIEF

Plaintiff in its complaint asks this Court to enjoin the defendants, and all persons in active concert with them, from seizing any of the prints of the motion picture film "I Am Curious (Yellow)", or threatening to do so, or arresting the theatre manager or other employees of the Midfield Theatre, or otherwise threatening or interfering with the showing of said motion picture; further, to enjoin the defendants from seizing any similarly-rated motion picture film arbitrarily and without a prior bona fide adversary hearing on the question of obscenity vel non. In support of its application for injunctive relief, plaintiff in substance contends that:

(1) the motion picture film "I Am Curious (Yellow)", as a matter of law, is not obscene and is Constitutionally protected material;

(2) the defendants have by the issuance of their respective written notices of November 21, 1969 to the manager of the Midfield Theatre, and by their threats to arrest her and seize the print of the motion picture film "I Am Curious (Yellow)", acted in bad faith and for the purpose of interfering with the distribution and exhibition of said motion picture film;

(3) the defendants have by their conduct acted contrary to the rights, privileges and immunities guaranteed plaintiff by the First, Fourth and Fourteenth Amendments to the Constitution of the United States, and as

a proximate result thereof have unconstitutionally applied Act No. 698 in this case;

(4) plaintiff has by virtue of the said conduct of defendants, and by virtue of defendants' labeling and characterizing the motion picture film "I Am Curious (Yellow)" as obscene, caused plaintiff to suffer irreparable injury and damage in that plaintiff will be prevented from the free and uninterrupted dissemination and exhibition of said motion picture film as guaranteed by the Constitution;

(5) said threats of arrest and seizure have produced a chilling effect on the Constitutionally protected rights of the plaintiff and members of the public over 18 years of age;

(6) the said motion picture film produces revenue for the plaintiff and its licensees totaling in excess of $4,000 per day; and

(7) the conduct of the defendants has caused a large number of adult members of the public not to attend the showing of said motion picture, thereby depriving plaintiff of large gains and proceeds.

Plaintiff relies on Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), which held that the petitioners therein were entitled to an injunction to prevent state law enforcement officers from prosecuting them or threatening to prosecute them under a State statute which was held to be so broad and vague that it interfered unconstitutionally with First Amendment rights. *Dombrowski* was an attack upon Louisiana statutes on subversive activities and the "Communist Propaganda Control Law." Plaintiffs were active in the Negro Civil Rights movement and claimed the threatened prosecutions did not really seek convictions but were designed to harass and limit their right to free speech. The *Dombrowski* doctrine, as it is now referred to by Professor Wright,[2] establishes the rule that federal courts will grant injunctive relief only in exceptional circumstances "to prevent irreparable injury which is clear and imminent." These special circumstances have been held to be a showing of clear and irreparable injury, inadequacy of state remedies, or the circumstances set out in the *Dombrowski* case— invalid State laws and/or bad faith enforcement of valid State laws to restrict the exercise of valid First Amendment rights. The Court stated that the prospect of a criminal prosecution, in the now famous language, had a "chilling effect upon the exercise of First Amendment rights."[3] See also, Sheridan v. Garrison, 415 F.2d 699 (5th Cir. 1969); Machesky v. Bizzell, 414 F.2d 283 (5th Cir. 1969).

We are of the opinion that in order to obtain both declaratory and injunctive relief as in *Dombrowski*, it is particularly necessary to have a case with facts very close to those of *Dombrowski* itself. The Supreme Court has said the mere allegation that a particular State statute is unconstitutional does not in and of itself merit injunctive relief, Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959). The Court recognized in *Dombrowski* that "federal interference with a state's good faith administration of its criminal laws is particularly inconsistent with our federal framework." Interference by injunction is proper only when unusual circumstances require it to prevent irreparable injury. The Court in *Dombrowski* further stated that it is generally to be assumed that State courts and prosecutors will observe Constitu-

---

2. Wright, Federal Courts, § 52, at 206 (1970).

3. The Court reasoned that the rationale for the issuance of an injunction is that protracted and piecemeal state litigation is not only incapable of resolving the constitutional issue, but by making the petitioners await the outcome produces a "chilling effect" on freedom of expression, thus allowing the states to restrict first amendment freedoms. The chilling effect in turn produces the irreparable injury required for the issuance of an injunction. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116.

tional limitations as expounded by this Court and that the mere possibility of erroneous initial application of Constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly State proceedings.

■ The burden of proof which plaintiff must sustain in order to be entitled to injunctive relief is, certainly, a heavy one. Mr. Justice Fortas, in his opinion dissenting to the denial of relief in Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), characterized this burden as follows:

> *Dombrowski* is strong medicine. It involves interposition of federal power at the threshold stage of the administration of state criminal laws. *Dombrowski's* remedy is justified only when First Amendment rights, which are basic to our freedom, are imperiled by calculated, deliberate state assault. And those who seek federal intervention bear a heavy burden to show that the State, in prosecuting them, is not engaged in use of its police power for legitimate ends, but is deliberately invoking it to harass or suppress First Amendment rights. *Dombrowski* should never be invoked when the State is, in substance and truth, engaged in the enforcement of valid criminal laws. Ordinarily, the presumption that the State's motive was law enforcement and not interference with speech or assembly will carry the day. (390 U.S., at p. 623, 88 S.Ct., at p. 1342)

■ We are of the opinion that no special circumstances have been shown in this case which would justify the granting of equitable relief by way of injunction against these defendants. We find no basis for the charge that the defendants have acted out of a desire to injure the business and reputation of the plaintiff and of its film "I Am Curious (Yellow)" with the avowed purpose of depriving or prohibiting the exhibition of said film. The Court is convinced from the evidence that the alleged threats of arrest and seizure were not made in bad faith and for the purpose of depriving the plaintiff of its First Amendment freedoms. No criminal prosecutions have been initiated against plaintiff. By order of this Court plaintiff was placed in possession of its property, the film, and the defendants were directed not to interfere with the peaceful possession thereof. Rather, we are inclined toward the view that plaintiff is really as much if not more motivated by reasons of profit and economic advancement than by thoughts of securing free expression of First Amendment rights. Oftentimes the wolf seeks entrance by putting on lamb's clothing. An examination of the testimony and affidavit of Paul A. Engler, Jr., as well as other items in the record, will, we feel, more clearly unearth what appears to us as the true results which plaintiff seeks to gain through this litigation. In his affidavit submitted in the State court proceedings Mr. Engler stated, "Had the sheriff not caused all the furor and publicity, in my opinion, this picture would have run its course and died because it is not 'box office'. Had I viewed this film privately for the first time in the United States, I would never have played it because it is a poor box-office type film." On cross-examination Mr. Engler was asked, "In your opinion has litigation over the showing of 'I Am Curious (Yellow)' increased its attendance in this county"? His response was "definitely". On further cross-examination Mr. Engler was asked, "Do you have an opinion as to what income receipts this motion picture will produce if allowed to be shown in the Midfield Theatre in the Bessemer Division of Jefferson County"? His response was, "In excess of a hundred thousand ($100,000.-00) dollars." We feel that this testimony when considered in connection with the allegation in plaintiff's complaint that this motion picture film produces revenue for plaintiff and its licensees totaling in excess of $4,000 per day point up a strong desire to protect an economic interest rather than advance the cause of free exercise of Constitutional rights. The "chilling effect" com-

plained of is economic—not freedom of expression. We by no means impugn plaintiff's effort; however, under the circumstances of this case we do not find such a deprivation of basic First Amendment freedoms as would justify injunctive relief.

■ Plaintiff further seeks to have this Court enjoin the Circuit Court of Alabama in the case initiated by the theatre manager against the defendants herein from including Grove Press, Inc. as a party cross-respondent therein, and further to enjoin the defendants, and all persons in active concert with them, from proceeding against Grove Press, Inc. in the State court proceedings.

Defendants contend that Tit. 28, U.S.C. § 2283, "the Anti-Injunction Act", forbids granting this relief because it would be directly opposite and contrary to the action of the State court in the suit now pending in which plaintiff has been named as a party cross-respondent. The "Anti-Injunction Act" reads in its entirety as follows:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress or where necessary in aid of its jurisdiction or to protect or effectuate its judgments.

We are persuaded that under the circumstances of this case the granting of injunctive relief would in fact amount to a stay of the State court proceedings in which plaintiff herein is a party. No amount of tortured reasoning by us will suffice to force the factual situation of this case into fitting any of the above enumerated statutory exceptions. Mitchum, d/b/a The Book Mart v. Clinton E. Foster, PCA 2224 (N.D.Fla., filed July 22, 1970). We do not find, as plaintiff contends, that the attempted inclusion of plaintiff as a party in the State court proceedings is further evidence of the bad faith of the defendants. Certainly defendants had a right under the fictitious party practice in State court to substitute plaintiffs in lieu of the X, Y, Z corporation identified in the cross-bill as the corporation causing to be exhibited that certain film, "I Am Curious (Yellow)", at the Midfield Theatre.

For these reasons, we find that no showing has been made to justify this Court's granting injunctive relief.

## DECLARATORY RELIEF

Plaintiff contends this Court must rule on the Constitutionality of the State law attacked under the claim for declaratory judgment in view of the decisions of the United States Supreme Court in Dombrowski v. Pfister, supra, and Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). In support of this contention, the plaintiff avers that Act No. 698 is on its face repugnant to the guarantees of free expression secured by the Constitution in that it is Constitutionally vague, is lacking in proper safeguards for the protection of First Amendment rights, and is couched in such loose and vague terms that it suffers from impermissible overbreadth which would result in Constitutionally protected material being seized and suppressed.

Defendants have filed a motion to dismiss or, alternatively, for abatement, stay, or abstention. While defendants have subsequently filed an answer, the Court has reserved ruling on this motion. The gravamen of defendants' motion is that since there is now pending in the Bessemer Division of the Tenth Judicial Circuit Court of Alabama, Case No. 24924, In Equity, a suit involving the same parties and claims, this Court should exercise its wise discretion and under the doctrines of abstention and comity stay its hand until these parties can secure from the State court a decision on the unlitigated questions of State law.

A review of the State court proceedings is necessary at this juncture in order to fully understand the import of defendants' motion. Initially, a bill of complaint was filed by the licensee of Grove Press, Inc., Mrs. Kathryn C. Cooper, in the Circuit Court for the Tenth

Judicial Circuit of Alabama, Bessemer Division, In Equity, which sought a temporary Writ of Injunction. The respondents in that case are the defendants in this case. This complaint alleged that the motion picture film, "I Am Curious (Yellow)", was not obscene and was a Constitutionally protected form of expression. The complaint further alleged that an arrest of Mrs. Kathryn C. Cooper, manager of the Midfield Theatre, by the respondents or anyone acting in concert with them would be a violation of the complainant's rights under the First, Fourth and Fourteenth Amendments of the United States Constitution, and Section 4 of the Constitution of 1901 of the State of Alabama. Respondents, in addition to filing an answer to this bill of complaint, also filed a cross-bill in which they asked for injunctive relief and a declaratory judgment. Subsequently, respondents amended their cross-bill by substituting as a party cross-respondent Grove Press, Inc., the plaintiff herein, in lieu of X, Y, Z corporation identified in the cross-bill as the corporation causing to be exhibited the motion picture film, "I Am Curious (Yellow)". The Circuit Court initially issued a temporary Writ of Injunction. Four days later, upon motion of the respondents, this injunction was dissolved. The same day and before the entry of that order, the petitioner filed this action.

Plaintiff contends that there is no identity of claims in the State court proceeding and the one proceeding in Federal Court. Plaintiff argues that in the State court proceeding there is no question with respect to the Constitutionality of Act No. 698, which forms one of the bases of the federal court action, and for the defendants to contend otherwise is simply an attempt to put stumbling blocks in the path of those who would exercise rights protected by the First Amendment. We are not so persuaded. In the State court proceeding the question raised by Mrs. Cooper in her bill of complaint was a request for a temporary Writ of Injunction. In support of her claim, she alleged that she was being deprived of the free expression of her First Amendment rights as guaranteed her by the Constitution. The question raised by the respondents in their cross-bill was a request for a declaratory judgment to declare the rights of the parties under Act No. 698. We are convinced that the issues in both federal and state courts are identical. We fail to see how the State court can make a proper determination of the issues placed before it without a thorough consideration of the Constitutionality of Act No. 698. It goes without question that unless specifically exempted by act of Congress State courts have concurrent jurisdiction, and may entertain an action even though it is entirely based on a federal claim. Charles Dowd Box Co., Inc. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962).

Plaintiff further contends that the attempted inclusion of Grove Press, Inc. as a party cross-respondent in the State court proceeding is simply another piece of evidence which establishes the bad faith application of Act No. 698 in that the defendants by this attempt have sought to restrict all litigation concerning the motion picture film, "I Am Curious (Yellow)", to the State courts where the process of trial and review is often cumbersome and protracted. Again we fail to see the merit of this contention. Grove Press, Inc. was substituted as a party cross-respondent in the State court proceeding pursuant to the Alabama fictitious party practice in equity court. Clearly the respondents had a right to follow this well-established procedure of the State court, and we fail to see the motive of bad faith when respondents were doing something they had a legal right to do.

Heretofore the pendency of an action in State court has not necessarily been a bar to the commencement of a proceeding in the federal courts raising the very same questions. Kline v. Burke Construction Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922). It hardly seems appropriate to us that with our judicial

resources taxed to the extent they are, actions should proceed simultaneously in both courts with the judgment in one ultimately to be utilized as *res judicata* in the second. Certainly proceedings in two courts to resolve the same questions between the same parties is a patent abuse of the judicial system. The defendants here suggest in their motion that the appropriate method of dealing with this particular situation is a stay of the proceedings in the second court. We find this suggestion particularly appealing when we consider the fact that this is an action challenging the Constitutionality of the State statute which has not yet been construed by the courts of the State of Alabama.

 One of the major undergirdings of the federal abstention doctrine is the avoidance of unnecessary state-federal conflicts. This relationship has always been analyzed as a balancing of interests between the federal and State courts. As stated by Mr. Justice Harlan in his concurring opinion in Zwickler, supra, 389 U.S. at p. 255, 88 S. Ct. at p. 399:

> This Court has repeatedly indicated that "abstention" is appropriate "where the order to the parties to repair to the state court would clearly serve one of two important countervailing interests: either the avoidance of a premature and perhaps unnecessary decision of a serious federal constitutional question, or the avoidance of the hazard of unsettling some delicate balance in the area of federal-state relationships." Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 32, 79 S.Ct. 1070, 1074, [3 L.Ed.2d 1058] (dissenting opinion). See generally Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152; Allegheny County v. Frank Mashuda Co., 360 U.S. 185, 188–189, 79 S.Ct. 1060, 1062–1063, 3 L.Ed.2d 1163. The first of these interests has been found in cases in which the federal constitutional issue might be mooted or "presented in a different posture" by a state court determina-

tion of pertinent state law. See, e. g., Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355; Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725. The second of these interests has been found, for example, in situations in which the exercise of jurisdiction by a federal court would disrupt a state administrative process, Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; interfere with the collection of state taxes, Toomer v. Witsell, 334 U.S. 385, 392, 68 S.Ct. 1156, 1160, 92 L.Ed. 1460; or otherwise create "needless friction" between the enforcement of state and federal policies. Louisiana Power & Light Co. v. City of Thibodaux, *supra*, 360 U.S. at 33, 79 S.Ct. 1070. See also Harrison v. NAACP, *supra*.

Abstention cases run the gamut of factual situations. The doctrine itself was born a little more than a quarter of a century ago in Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Mr. Justice Frankfurter, writing for the Court, interpreted the jurisprudence as reflecting "a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary." In examining the abstention doctrine in relation to State administrative functions, one of the main concerns of the Supreme Court seems to be a weighing of the federal interest against the amount of disruption of State domestic policies which might be caused by a federal decision. As the Court stated in Harrison v. NAACP, supra, 360 U.S. at p. 177, 79 S.Ct. at p. 1030:

> * * * This principle does not of course involve the abstention of federal jurisdiction, but only the post-

ponement of its exercise; it serves the policy of comity inherent in the doctrine of abstention; and it spares the federal courts of unnecessary constitutional adjudication.

While the federal courts have abstained in cases involving unclear and unlitigated State law in order to avoid Constitutional issues and unnecessary friction, the Supreme Court in one line of cases has held that uncertain State law is by itself no ground for abstention in a diversity case. Meredith v. Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L. Ed. 9 (1943). The *Meredith* rule was cast in doubt by the 1959 decision of the Supreme Court in Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959). In this case the Court held that in a State eminent domain proceeding involving an unclear State statute, where the sole basis of jurisdiction was diversity of citizenship, the district judge properly abstained "rather than himself make a dubious and tentative forecast." The influence of *Thibodaux* is especially to be noted in decisions rendered by the Fifth Circuit Court of Appeals. In United Services Life Ins. Co. v. Delaney, C.A. 5th, 1964, 328 F.2d 483, cert. denied Paul Revere Life Ins. Co. v. First Nat. Bank in Dallas, 377 U.S. 935, 84 S. Ct. 1335, 12 L.Ed.2d 298 (1964), the Fifth Circuit Court of Appeals extended the doctrine of abstention beyond previously recognized boundaries. The Court applied the doctrine of abstention in a case in which the only problem was a matter of unclear State law. *Delaney* was a case involving two questions of Texas insurance law. In an en banc proceeding the Court held by a margin of 5 to 4 that abstention was proper because the "guidance of the dim light of the Texas decisions leaves the meaning of the question clauses obscure."

Chief Judge Brown, in a concurring opinion, stated at p. 485 of 328 F.2d:

Abstention in a diversity case is no more an abdication of the constitutional-statutory duty to decide than is abstention in the field of determination of federal questions in which the Federal Courts have a "primacy." England v. Louisiana State Board of Medical Examiners, 1964, [375 U.S. 411], 84 S.Ct. 461, [11 L.Ed.2d 440].

Abstention is neither abandonment of *duty,* on the one hand, nor a problem of raw power, on the other. It is judge-fashioned and being such, the cloth should be cut to the pattern.

The doctrine is, of course, a means devised to ameliorate some of the problems inevitably growing out of our unique federalism. For federal question cases, unseemly or unnecessary collision with a state is to be avoided, or at least postponed until such time as it is inescapable. Although the adjustment between the National Courts and a State takes a different turn in diversity cases, the underlying problem is essentially the same. And the impact—on local litigants and jurisprudence—is equally, if not more, awesome. This concern is, for example, reflected by the "outcome determinative" test likewise judge-fashioned to meet the needs of Erie, only few of which had emerged when Meredith (note 1, supra) was announced in 1943. This approach recognizes that it is basically unfair for decision to turn on irrelevant accidents such as state citizenship, residence, geography, or the case being filed in one courthouse rather than in the one a block down the street.

Keeping in mind the underlying principle that abstention is an exercise of judicial discretion through a theory of balancing of the interest involved, we now turn to a consideration of the arguments advanced by plaintiff in his complaint. Plaintiff relies on Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), and Zwickler v. Koota, supra, Dombrowski v. Pfister, supra, for the proposition that the abstention doctrine is inappropriate for cases where statutes are justifiably attacked on their face as abridging free expression or as applied for the purpose of discouraging protected activities. In

*Zwickler*, the plaintiff sought injunctive and declaratory relief from future arrests and prosecution under a New York penal law making it a crime to disseminate in quantity anonymous political leaflets. A previous conviction under the law had been reversed by a New York Supreme Court on State law grounds and this reversal was affirmed by the New York Court of Appeals. People v. Zwickler, 16 N.Y.2d 1069, 266 N.Y.S.2d 140, 213 N.E.2d 467. During future arrests for distribution, *Zwickler* invoked the jurisdiction of a three-judge federal district court, 261 F.Supp. 985, challenging the statute on the ground that it was overbroad and therefore violated the Constitutional guarantee of free expression.

The three-judge court, one judge dissenting, applied the doctrine of abstention and dismissed the case because no "special circumstances" justifying the exercise of federal judicial equity power were present and because *Zwickler* had a declaratory judgment remedy in State courts and he also could assert his Constitutional challenge in defense of any future criminal prosecution in a State court. The Supreme Court of the United States reversed, emphasizing the Congressional expansion of the federal judicial power since the Civil War which "imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his special constitutional claims." From this the Court reasoned that the suitor's choice of a federal forum must be respected and a federal court lacks discretion to abstain from ruling on a direct request for declaratory relief when the suitor's Constitutional attack is that the statute is facially void for overbreadth, thus offending the Constitutional principle that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." Zwickler v. Koota, supra, 88 S.Ct. at p. 396.

■ The circumstance present here, not present in *Zwickler* is that there is now pending in State court a suit which involves the same parties and claims as are now before this Court. We cannot agree that *Zwickler* is so doctrinaire that it deprives a federal court of the discretion to abstain under the circumstances of this case. We agree with the statement of Judge Brown in *Delaney* that the abstention doctrine is judge-made, and as such, the cloth should be cut to the pattern. Underlying the doctrine of abstention is the theory that abstention is not an abdication of federal jurisdiction, but merely a postponement of its exercise. This is based on the assumption that the State courts are as competent to protect the Constitutional rights of the accused as the federal courts. We hold the view that in the scheme of the Constitution, State courts are the primary guarantors of Constitutional rights, and in many cases they may be the ultimate ones. This view has by no means been shared by all those connected with the federal courts.

■ We entertain serious doubts about the appropriateness of stopping the pending State court action to consider plaintiff's request for a declaratory judgment as to the Constitutionality of Act No. 698, the subject of which is also before the State court. We find that far more serious considerations in the federal-state relationship are involved when a State court proceeding is pending under the statute from which declaratory relief is sought in the federal forum. When no State court proceeding is pending, a lack of discretion in the federal court to abstain simply relieves the suitor of having to first proceed in the State forum. However, when a State court proceeding is pending which involves the same parties and claims as are present in the federal forum, a lack of discretion of the federal court to abstain disrupts and intrudes into case proceedings in the State court and takes from that court issues appropriate for determination in that proceeding. Giving a suitor a choice of a

federal forum for his Constitutional claims in a case in which there is pending prosecution in the State court would only be justified if it can be presumed that State courts will not responsibly guard, enforce, and protect First Amendment rights. No such presumption ought to be indulged. Vick v. Schiro, 296 F. Supp. 173 (E.D.La.1969). While the wisdom of abstaining from Constitutional adjudication may be a matter of preference or temperament, there are surely strong reasons to abstain when the interest of the State is taken into account. Here, an instrument of the State (the Circuit Court of Jefferson County, Bessemer Division) has acted in a way contrary to the interest of the plaintiff. The plaintiff may be correct and the State's instrument may have acted improperly, but to insure that its policy is correctly administered the State has provided a forum for review. In fact, we are informed by the parties that the State court suit is now on appeal to the Alabama Court of Civil Appeals. For the federal courts to ignore this mechanism and inject into the State's procedures a Constitutional mandate before it is absolutely necessary to do so deprives a State of an important opportunity to administer its own affairs. The abstention doctrine has received its most extensive treatment in cases which could be settled by a determination of the State law. It is a common characteristic of most if not all of these cases that the State law questions were unsettled or at least unclear and that a resolution of these questions was sufficient to decide the case. It surely must be unflattering for a State judge to know that a suit brought in his court may be properly removed to a federal court, purportedly, because he cannot be trusted to decide it correctly.

█ As held earlier, we do not find such bad faith enforcement resulting in irreparable injury as would call for the granting of federal injunctive relief. To hold now that any allegation of statutory overbreadth or vagueness made after the State court proceedings have already been initiated deprives a district court of the right to abstain would effectively force a federal court to intervene in even good faith prosecutions, a consequence prohibited by *Dombrowski* and *Zwickler*. In Baggett v. Bullitt, supra, the Court said, 377 U.S. at p. 375, 84 S.Ct. at p. 60:

> \* \* \* The abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers. Ascertainment of whether there exist the "special circumstances," \* \* \* prerequisite to its application must be made on a case-by-case basis. \* \* \* (Citation omitted)

In this case we find those requisite "special circumstances" which make abstention proper. This is an action challenging the Constitutionality of a State statute which has never been construed by the highest court of the State. The questions of the Constitutionality of this statute and its interpretation are now pending in the State court action. The parties here and in the State action contend for different interpretations of the statute. Thus, the statute before this Court is placed in a different posture than the statute before the Court in *Zwickler* where both parties acknowledged the statute to be clear and precise and there was no possibility of a narrowing construction by the State court. We are sure that given a chance to speak, the Alabama courts will competently determine the Constitutionality of Act No. 698 under both the State and Federal Constitutions and at the same time interpret it. This interpretation, which is peculiarly a role for the State courts, may limit the statutory meaning to remove any Constitutional problem. Obscenity is not protected, and State legislatures have the right to regulate it within the Constitutional framework. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). We feel that in this sensitive and unsettled area of obscenity State courts should not be bypassed, but rather should be given the

opportunity to judicially construe statutes passed by their own State legislatures in an effort to exercise a legitimate legislative power. We do not mean to leave even the whisper of a suggestion as to our view of the Constitutionality of the statute, a question we choose not to reach, at least at this time.

For this reason we feel it proper to grant defendants' motion to stay, but retain jurisdiction of the cause pending the outcome of the State litigation.

## Appendix A

Act No. 698

> S. 45—Gilmore, Oden, Pierce, Nabors, Turner, Engel, Cooper, Torbert, Clark, Vacca, Childs, Branyon, Folsom, Bailes, Pelham, McDermott, Harris, Jackson, Carr, Albea, McCarley, Leonard, Giles

## AN ACT

To prohibit the exposing of obscene and harmful materials to persons eighteen years of age and older; to define terms and to prescribe penalties.

*Be It Enacted by the Legislature of Alabama:*

*Section 1.* Definitions. As used in this Act.

(a) "Nudity" means the showing of the human male or female genitals, pubic area or buttocks with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state.

(b) "Sexual conduct" means act of masturbation, homosexuality, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast.

(c) "Sexual excitement" means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

(d) "Sado-masochistic abuse" means flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

(f) "Obscene" means that description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse, when it:

(i) predominantly appeals to the prurient, shameful or morbid interest, and (ii) is patently offensive to prevailing or contemporary standards in the adult community as a whole with respect to what is suitable material, and (iii) is utterly without redeeming social value or importance.

(g) "Hard-core pornography" means material, when considered as a whole, its predominant appeal is to prurient interest, is patently offensive to prevailing or contemporary standards, is utterly without redeeming social value or importance and in addition it goes substantially beyond customary limits of candor in describing or representing such matters.

(h) "Knowingly" means having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry or both:

(i) the character and content of any material described herein which is reasonably susceptible of examination by the defendant.

(ii) such term includes the calculated purveyance of filth.

(i) Mailable matter means (a) printed or written matter or material having second-class mailing privileges under the laws of the United States; or (b) any other printed or written matter or material which has not been determined to be non-mailable under the laws of the United States.

*Section 2. Selling, exhibiting or possessing obscene materials.* It shall be unlawful for any person knowingly to sell or loan for monetary consideration

to a person eighteen years of age or older:

(a) any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts nudity, sexual conduct or sado-masochistic abuse and which is obscene or represents hard-core pornography.

(b) any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (a) of section 2 hereof, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sado-masochistic abuse and which, taken as a whole, is obscene or represents hard-core pornography.

(c) Nothing in this section shall be deemed to apply to mailable matter unless such mailable matter is known by such person to have been judicially found to be obscene or to represent hard-core pornography under this act or under the provisions of any other Alabama statutes.

*Section 3.* It shall be unlawful for any person knowingly to exhibit for a monetary consideration to another or knowingly to sell to another an admission ticket or pass or knowingly to admit another for a monetary consideration to premises whereon there is exhibited, a motion picture, show or other presentation which, in whole or in part, depicts nudity, sexual conduct or sado-masochistic abuse which is obscene or represents hard-core pornography.

*Section 4.* (a) No prosecution may be commenced against any person for violating Sections 2 and 3 of this Act unless the accused is first served with prior written notice that there is reasonable cause to believe the material upon which such prosecution is based violates this Act, and the accused has, after receiving such notice violated this Act.

(b) The written notice provided for in paragraph (a) of this Section 4 may be given by only the following officials: the State Attorney General and any As-sistant Attorney General; the district attorney, county solicitor, their assistants and deputies, or any person whose office and duty is to prosecute criminal actions before any state, county or municipal court; the sheriff; the chief of police of any municipality or town; and the duly authorized law enforcement employees of the Department of Public Safety.

(c) Any person receiving such written notice provided for in paragraph (a) of this Section 4 shall have the right within 30 days from such notice to file an appropriate action for declaratory judgment to determine the validity of such written notice, but no such action shall, by reason of the commencement thereof, stay or in any way delay or postpone any prosecution for the violation of this Act.

*Section 5.* Any person, firm or corporation violating any provision of this Act shall be guilty of a misdemeanor and upon conviction shall be imprisoned in the county jail or sentenced to hard labor for the county, for not more than one year, and may be fined not more than two thousand dollars ($2,000.00) for each offense, or be both so imprisoned and fined, in the discretion of the court.

*Section 6.* The provisions of this Act are cumulative and shall be in addition to any and all laws now enacted dealing with obscene or hard-core pornography and shall not be construed to limit or repeal other laws on such matters and shall specifically apply to the exposing of obscene and harmful materials to persons eighteen years of age and older.

*Section 7.* This Act shall become effective immediately upon its passage and approval by the Governor or upon its otherwise becoming a law.

Approved September 10, 1969.

Time: 4:20 P.M.

RIVES, Circuit Judge (dissenting):

I respectfully dissent. Under threat of arrest, the plaintiff has been prevented from exhibiting its motion picture film in the State of Alabama since No-

vember 21, 1969. For this claimed violation of its First Amendment rights, the plaintiff has been seeking relief from this Court since November 26, 1969. On December 23, 1969, Judge McFadden denied the plaintiff's prayer for a temporary order restraining the defendants *from seizing any of the prints of the motion picture film or threatening to do so, or arresting the manager or other employee of the theater, or otherwise threatening and/or interfering with the exhibition of the plaintiff's motion picture film.* With ruling reserved on the defendants' motion to dismiss, or, in the alternative, for abatement, stay or abstention, the case was heard and submitted on its merits on February 2, 1970. Now, after holding the case under submission for more than six months, the majority of this Court refuses to give the plaintiff any definite answer to its prayer for relief, applies one or more of the doctrines of abstention, grants the defendants' motion to stay, and retains jurisdiction of the cause pending the outcome of the State litigation.

## ABSTENTION

For each of my distinguished colleagues, both as an individual and as a judge, I entertain the highest respect, but after the most careful consideration, I would be less than candid if I did not say that my thinking is so far different from theirs that to join my colleagues in abstaining would be for me nothing short of abdication of my judicial duties. Again I repeat that my colleagues are my friends and I respect them as good conscientious judges. Abstaining seems to them the exercise of wise judicial discretion. It seems to me unthinkable poison.

*My colleagues recognized the difference in our judicial philosophies when they wrote on page 254 of their opinion:* "We hold the view that in the scheme of the Constitution, State courts are the primary guarantors of Constitutional rights, and in many cases they may be the ultimate ones. This view has by no means been shared by all those connected with the federal courts." As far back as 1956 in refusing to abstain in the Montgomery bus boycott case, I had written:

"The short answer is that doctrine has no application where the plaintiffs complain that they are being deprived of constitutional civil rights, for the protection of which the Federal courts have a responsibility as heavy as that which rests on the State courts.[11]

"11. Lane v. Wilson, 307 U.S. 268, 274, 59 S.Ct. 872, 83 L.Ed. 1281; Mitchell v. Wright, 5 Cir., 154 F.2d 924, 926; Romero v. Weakley, 9 Cir., 226 F.2d 399, 402; Wilson v. Beebe, D.C.Del., 99 F.Supp. 418, 420. Cf. Doud v. Hodge, 350 U.S. 485, 487, 76 S.Ct. 491, [100 L.Ed. 577]."

Browder v. Gayle, M.D.Ala., 1956, 142 F.Supp. 707, 713.

The decision in that case was summarily affirmed by the Supreme Court. Gayle v. Browder, 1956, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114. Again in England v. Louisiana State Board of Medical Examiners, 1964, 375 U.S. 411, 415, 416, 84 S.Ct. 461, 464, 11 L.Ed.2d 440, Mr. Justice Brennan speaking for the Court said:

"There are fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims.[5] Such a result would

"5. At least this is true in a case, like the instant one, not involving the possibility of unwarranted disruption of a state administrative process. Compare Burford v. Sun Oil Co., 319 U.S. 315 [63 S.Ct. 1098, 87 L.Ed. 1424]; Alabama Public Service Comm'n v. Southern R. Co., 341 U.S. 341 [71 S.Ct. 762, 95 L. Ed. 1002].

be at war with the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred specific categories of jurisdiction upon the federal courts, and with the principle that 'When a Federal court is properly appealed to in a case over

which it has by law jurisdiction, it is its duty to take such jurisdiction * *. The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied.' Willcox v. [Consolidated Gas Co., 212 U.S.] 19, 40 [29 S.Ct. 192, 195, 53 L.Ed. 382]. Nor does anything in the abstention doctrine require or support such a result. Abstention is a judge-fashioned vehicle for according appropriate deference to the 'respective competence of the state and federal court systems.' Louisiana P. & L. Co. v. Thibodaux, 360 U.S. 25, 29 [79 S.Ct. 1070, 1073, L.Ed.2d 1058]. Its recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law [6]. * * *

"[6]. See Kurland, Toward a Co-operative Judicial Federalism: The Federal Court Abstention Doctrine, 24 F.R.D. 481, 487."

In Zwickler v. Koota, 1967, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444, the Supreme Court not only approved its holding in *England* that it is the federal judiciary which has the "primacy * * in deciding questions of federal law" (389 U.S. at 252, 88 S.Ct. at 397), but it elaborated on that thesis in unmistakable terms:

"During most of the Nation's first century, Congress relied on the state courts to vindicate essential rights arising under the Constitution and federal laws. The only exception was the 25th section of the Judiciary Act of 1789, 1 Stat. 85, providing for review in this Court when a claim of federal right was denied by a state court. But that policy was completely altered after the Civil War when nationalism dominated political thought and brought with it congressional investiture of the federal judiciary with enormously increased powers. The

Act of March 3, 1875, was the principal ' * * * measure of the broadening federal domain in the area of individual rights,' McNeese v. Board of Education, 373 U.S. 668, 673 [83 S.Ct. 1433, 1436, 10 L.Ed.2d 622]. By that statute ' * * * Congress gave the federal courts the vast range of power which had lain dormant in the Constitution since 1789. These courts ceased to be restricted tribunals of fair dealing between citizens of different states and became the *primary* and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States.' (Emphasis added.) Frankfurter & Landis, The Business of the Supreme Court: A Study in the Federal Judicial System 65." [Footnotes omitted. Emphasis that of the Court.]

389 U.S. at 245–247, 88 S.Ct. at 394–395. With deference to my colleagues, it is beyond my comprehension how they can justify the contrary doctrine which they advance.

Abstention simply has no place in the consideration of this case. The defendants make some contention that the instant action is an in rem proceeding. Neither of my colleagues expresses himself as in agreement with that contention, and it is difficult for me to believe that the defendants are serious in advancing it. We deal only with claims for declaratory and injunctive relief which are in personam in nature. The proceeding in the state court seeks injunctive relief only and is also in personam in nature.

I agree fully that we should not issue an injunction against the state court proceeding. Indeed we are denied any power to do so by 28 U.S.C. § 2283,[1] as recently construed in Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers, et al., 398 U.S. 281, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (Decided June

[1]. "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

8, 1970).[2] Justice Black, speaking for the Court, held an injunction not necessary in aid of the jurisdiction of the federal court for a reason which is applicable also to the prayer for declaratory judgment in the present case:

" * * * although it [the railroad] could have tendered its federal claims to the state court, it was also free to restrict the state complaint to state grounds alone. Cf. England v. Louisiana State Board of Medical Examiners, 375 U.S. 411 [84 S.Ct. 461, 11 L.Ed.2d 440] (1964). In short the state and federal courts had concurrent jurisdiction in this case, and neither court was free to prevent either party from simultaneously pursuing claims in both courts. Kline v. Burke Constr. Co., 260 U.S. 226 [43 S.Ct. 79, 67 L.Ed. 226] (1922); cf. Donovan v. Dallas, 377 U.S. 408 [84 S.Ct. 1579, 12 L.Ed.2d 409] (1964). Therefore the state court's assumption of jurisdiction over the state law claims and the federal preclusion issue did not hinder the federal court's jurisdiction so as to make an injunction *necessary* to aid that jurisdiction." (398 U.S. 295, 296, 90 S.Ct. 1747.)

However, assuming arguendo that I am mistaken and that abstention does have a place in the consideration of this case, I submit that we should not abstain from declaring the rights of the parties, for at least two reasons: 1. A state statute is being attacked as repugnant to the First Amendment and the delay from requiring recourse to the state courts might chill the very constitutional right which the plaintiff seeks to protect. Zwickler v. Koota, 1967, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444. 2. For reasons next to be stated, I submit that it is clear that the state statute is unconstitutional no matter how it may be construed by the state courts. Harman v. Forssenius, 1965, 380 U.S. 528, 534–535, 85 S.Ct. 1177, 14 L.Ed.2d 50; McNeese v. Board of Education, 1963, 373 U.S. 668, 673–674, 83 S.Ct. 1433, 10 L.Ed.2d 622.

## CONSTITUTIONALITY

In my opinion Act No. 698, Acts of Alabama 1969,[3] is unconstitutional both on its face and as here applied. It seems so clear to me that the Act must fall because of the constitutional insufficiency of Section 4 that I see no need for me to consider the constitutionality of Sections 1, 2 and 3.[4]

Under Section 4, any one of a broad range of law enforcement officials [5] may give a prospective accused written notice that there is reasonable cause to believe that the material upon which the prosecution may be based is obscene or represents hardcore pornography. Only if the accused sells or exhibits, etc., such material after receiving such a warning notice can criminal prosecution be commenced against him for violating Sections 2 and 3 of the Act.

Under Section 4 of the Act, a prospective accused having received a notice has three alternatives: (1) He can cease exhibiting, publishing, selling, etc., the material in question, and thus forego the exercise of his first amendment rights; (2) he can institute a declaratory judgment action or other test proceeding to determine the validity of the notice, while foregoing exercise of his first amendment rights; or (3) he can continue to exhibit, publish, etc., the material and become subject to criminal prosecution. It can reasonably be foreseen that most persons having received such

---

2. Followed in Pacific Indemnity Co. v. Acel Delivery Service, 5 Cir. 1970, 432 F.2d 952.

3. Attached as Appendix A to majority opinion.

4. The Alabama Legislature may, however, be well advised to remove some of the occasions of doubtful constitutionality in those sections revealed in the plaintiff's briefs.

5. See Sec. 4(b) of Act, Appendix A to majority opinion.

a notice will act as did Mrs. Cooper in this case, that is, cease and desist publication at least until a judicial determination of the question of obscenity.[6] Thus, the Act in effect establishes a form of coerced self-censorship.[7]

Section 4 and its application clearly establish a prior restraint on expression of first amendment rights. As the Supreme Court stated in *Bantam Books, supra*, 372 U.S. at 70, 83 S.Ct. at 639: "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. * * * We have tolerated such a system only where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint."[8]

Here, the warning scheme established in Section 4 fails to meet the "heavy presumption against its constitutional validity." The system lacks judicial supervision and does not assure an almost immediate judicial determination on the question of obscenity. Law enforcement officials under Section 4(a) can effectively bar material upon the self-determination that it is obscene or represents hardcore pornography. As Judge Johnson concluded in Poulos v. Rucker, M.D. Ala.1968, 288 F.Supp. 305, 310: "It is also clear that even in the absence of seizure, threats of criminal prosecution by police officers or other administrative officials can constitute an all too effective prior restraint." *See* Dombrowski v. Pfister, 1965, 380 U.S. 479, 486, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22; NAACP v. Button, 1963, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405; Drive In Theatres, Inc. v. Huskey, W.D.N.C.1969, 305 F.Supp. 1232.

For the warning scheme in Section 4 to be a valid prior restraint,[9] it must operate " * * * under judicial superintendence and [assure] an almost immediate judicial determination of the validity of the restraint." *Bantam*

---

6. It is true that a person could ignore a warning given under Section 4(a) and continue to exhibit a motion picture film. However, the alternative of a criminal *prosecution is an effective restraint.* In Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 68, 83 S.Ct. 631, 638, 9 L.Ed.2d 584 (1963), the Supreme Court in voiding a similar warning scheme remarked: "People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around * * *."

7. "Self-censorship" is used to distinguish Section 4 from the classic forms of censorship, discussed in Freedman v. Maryland, 1965, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, and Times Film Corp. v. City of Chicago, 1961, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403, where motion picture films must be initially approved by a board of censors. The coercion is such as to place upon the state responsibility for the resulting "self-censorship."

8. The Court held in Times Film Corp. v. City of Chicago, *supra*, that a prior restraint was not unconstitutional *per se.*

9. Since arrests have not been made, this Court need not determine whether or not, absent a warning system, an adversary hearing is necessary before arrest, as has recently been held or intimated by several district courts. See Delta Book Distributors, Inc. v. Cronvich, E.D.La.1969, 304 F.Supp. 662, 667; Drive In Theatres, Inc. v. Huskey, W.D.N.C.1969, 305 F. Supp. 1232; Raphael v. Hogan, S.D. N.Y.1969, 305 F.Supp. 749, 757. In any event, as pointed out in *Bantam Books*, such a warning scheme creates hazards greater than those presented by simple arrest and prosecution:

"In thus obviating the need to employ criminal sanctions, the State has at the same time eliminated the safeguards of the criminal process. Criminal sanctions may be applied only after a determination of obscenity has been made in a criminal trial hedged about with the procedural safeguards of the criminal process. The Commission's practice is in striking contrast, in that it provides no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter. It is a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law." 372 U.S. 69, 70, 83 S.Ct. 639.

*Books, supra,* 372 U.S. at 70, 83 S.Ct. at 639.[10]

Section 4 involves more than informal, private consultation held permissible in *Bantam Books, supra.*[11] It is, in effect, a statutory warning that unless the distributor ceases exhibiting, publishing, selling, etc., the material in question, criminal prosecution will be initiated. True, Section 4 does not call for the express threat of prosecution. However, in my view, the absence or presence of an express threat of prosecution does not preclude Section 4 from operating as a prior restraint on first amendment rights.[12] After the written notice, the distributor must cease dissemination of his material or face criminal prosecution. The alternative of criminal prosecution is an effective restraint upon the exercise of one's first amendment rights. See note 6, *supra;* Poulos v. Rucker, M.D.Ala.1968, 288 F.Supp. 305, 310.

I consider the rationale of Freedman v. Maryland, 1965, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, and Lee Art Theatre, Inc. v. Virginia, 1968, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313, pertinent to the decision of this case. The Supreme Court found that the effort to censor material prior to distribution, *Freedman,* and the seizure of allegedly obscene material, *Lee Art Theatre,* were unconstitutional prior restraints absent certain judicial safeguards. The classic form of prior censorship in *Freedman* is little if any more effective or objectionable than the coerced self-censorship required by Section 4. See note 7, *supra.* The prior restraint invalidated in *Lee Art Theatre* was the seizure of an allegedly obscene film pursuant to a warrant issued solely on the conclusory assertion of a police officer that the film was obscene. Under Section 4, law enforcement officials can issue warnings, based upon their sole determination,[13] that there is reasonable cause to believe the material is obscene. This latter procedure, like that in *Lee Art Theatre,* is an effective restraint. And it is impermissible for the same reason, namely, that it is not " 'designed to focus searchingly on the question of obscenity,' * * and therefore [falls] short of constitutional requirements demanding necessary sensitivity to freedom of expression." 392 U.S. at 637, 88 S.Ct. at 2104.

Being of the firm opinion that the Act is unconstitutional on its face and as here applied, I do not reach the question of bad faith enforcement *vel non.* Nor do I reach the question of whether or not the film is obscene. *See* Teitel Film Corp. v. Cusack, 1968, 390 U.S. 139, n. 1, 88 S.Ct. 754, 19 L.Ed.2d 966; Entertainment Ventures, Inc. v. Brewer, M.D. Ala.1969, 306 F.Supp. 802, 805.

For the reasons stated, I respectfully dissent.

10. Under Freedman v. Maryland, 1965, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, the burden of initiating the adversary hearing and the burden of establishing the validity of the warning is on the State.

11. "In holding that the activities disclosed on this record are constitutionally proscribed, we do not mean to suggest that private consultation between law enforcement officers and distributors prior to the institution of a judicial proceeding can never be constitutionally permissible. We do not hold that law enforcement officers must renounce all informal contacts with persons suspected of violating valid laws prohibiting obscenity. Where such consultation is genuinely undertaken with the purpose of aiding the distributor to comply with such laws and avoid prosecution under them, it need not retard the full enjoyment of First Amendment freedoms." 372 U.S. 58, 71–72, 83 S.Ct. 631, 640.

12. Bantam Books, *supra,* 372 U.S. at 67–70, 83 S.Ct. 631. As the Court noted in *Bantam Books*: "It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments." *Id.* at 66, 83 S.Ct. at 637.

13. Some of the law enforcement officials issuing the warning did not view the entire film but relied on information from other officers. This application of the Act increases the potential for abuse under a statute regulating speech and expression.